James KANIFF, Plaintiff–Appellant,

v.

ALLSTATE INSURANCE COMPANY, Defendant–Appellee.

No. 96–1626.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1996.

Decided July 2, 1997.

Susan P. Malone (argued), Mary Sweeney, Chicago, IL, for Plaintiff–Appellant.

Michael A. Warner, Condon A. McGlothlen (argued), Gloria M. Portela, Pamela A. Davidson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and CUDAHY and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

James Kaniff brought this case against his former employer Allstate Insurance Company ("Allstate"), alleging that the termination of his employment was the result of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and disability discrimination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* He also asserted that Allstate had breached his employment contract. The district court granted summary judgment for Allstate on each of Kaniff's claims, and he now appeals, challenging the judgment against him only on the ADEA and breach of contract claims. For the following reasons, we affirm the district court's judgment.

**I.**

Allstate hired Kaniff as an insurance agent in 1962, and he worked in that capacity until his termination in May 1993. Kaniff's employment with Allstate was governed by the R–830 Agent Compensation Agreement, the relevant portions of which we construed in *Hudson v. Allstate Ins. Co.*, 93 F.3d 296 (7th Cir.1996).[1] Like that of the plaintiff in *Hudson*, Kaniff's employment agreement provided for termination by either party upon the mailing of a written notice of termination. Yet Allstate also agreed that it would not terminate Kaniff's employment "because of unsatisfactory work unless you have been notified that your work is unsatisfactory and that your job is in jeopardy and unless you have been given a reasonable opportunity to bring your performance up to satisfactory standards." (R. 66, Ex. K at 9.) A simultaneously-executed amendment to the R–830 agreement addressed the scope of the term "unsatisfactory work" in that provision:

> The term "unsatisfactory work" relates to the quality of performance. Notification that your job is in jeopardy is not required in the event of termination of employment for a criminal act or an act of dishonesty, such as, by way of example, but not limited to, the following: embezzlement, falsification of any Company or industry plan documents completed or approved by you in the performance of your duties, fraud or misrepresentation of material fact, or forgery. . . .

(*Id.* at 14.) *See also Hudson*, 93 F.3d at 297–98 (quoting in full relevant portions of R–830 agreement). Allstate relied on this amendment in effecting Kaniff's termination, for it apparently believed that Kaniff had engaged in one or more "acts of dishonesty" in connection with his employment. Yet Kaniff asserts in his age discrimination claim that his age played a determining role in Allstate's decision to terminate his employment. In the contract claim, moreover, Kaniff maintains that the real reason for his termination was unsatisfactory work, not an act of dishonesty. He therefore asserts that Allstate

---

**1.** Our *Hudson* decision was issued after the district court granted summary judgment in Kaniff's case.

breached the R–830 agreement by not complying with the notice provision. We outline the evidence relating to those arguments below, construing the record in the light most favorable to Kaniff.

Beginning in late 1989 or early 1990, Kaniff undertook to "capture" accounts assigned to his office that were not at the time represented by an Allstate agent. Those unrepresented accounts had at one point been serviced by an agent from Kaniff's office, but that agent had either died, retired, or otherwise terminated his relationship with Allstate. Upon the departure of an agent, the annual servicing commissions generated by his former accounts were shared by the office's remaining agents, but Allstate also permitted its agents to attempt to capture those accounts by contacting the insureds and selling them a new line of coverage. Once an account was captured in this way, the capturing agent would receive the entire annual commission generated by the account.

Due to the death or retirement of several of its agents, the Allstate office in which Kaniff worked had a large number of unrepresented accounts in 1989. It is undisputed that Kaniff set out to capture those accounts in order to secure for himself the renewal commissions they generated. He first obtained records relating to unrepresented accounts with homeowner's policies and then telephoned the insureds from his home either in the evenings or on Saturdays. To each insured so contacted Kaniff offered coverage for silverware, an item included in Allstate's major insurance line for scheduled personal property ("SPP"). The insured's agreement to purchase SPP coverage for silverware would enable Kaniff to capture the insured's account once the premium was paid, thereby entitling Kaniff to the account's annual commissions.

In May 1990, market team members for Allstate's Chicago Metro Region noticed an unusual amount of capturing activity in Kaniff's accounts, and team members therefore conducted a partial audit of those accounts. They discovered that Kaniff had captured approximately forty-four accounts since August 1989, all through the addition of SPP coverage for silverware. The market team noted that during the same time period, three insureds whose accounts Kaniff had captured had then requested that their new silverware coverage be canceled. The market team reported its findings to Bill Rathe, the human resources manager for Kaniff's region. Rathe then asked Carl Breitzke, an Allstate sales security analyst, to conduct a further investigation.

Breitzke attempted to contact the insureds identified in the market team's report and was able to reach twenty of the forty-four. Twelve of the twenty stated that they had been contacted by Kaniff and that they had agreed to add coverage for silverware to their existing homeowner's policies. Yet a number of the other insureds indicated that they had never spoken to Kaniff, or that Kaniff had contacted them to offer silverware coverage but they had refused. Indeed, a number of those insureds told Breitzke that they did not even own the type of silverware scheduled on their policies. Breitzke reported the results of his investigation to Allstate's Human Resources Department and recommended that the information be forwarded to the Corporate Security Department for further investigation, including an interview with Kaniff. Human Resources followed Breitzke's recommendation, informing Corporate Security Manager Jim Duffy that the results of its investigation varied but that it found the information sufficient to support the involvement of Corporate Security.

Duffy's first move was to ask that Breitzke attempt to contact the twenty-four insureds that he had been unable to reach previously. Breitzke made contact with five additional insureds in October 1993. One of those insureds was Gwendolyn Ottmers, who told Breitzke in a recorded statement that Kaniff had contacted her about adding silverware to her policy but that she had informed Kaniff she owned no silverware. Her next statement nonetheless included coverage for silverware, which prompted Ottmers to call Kaniff to ask that it be removed. Breitzke also obtained a recorded statement from Clarence Tognarini, who said that he had never been contacted by an Allstate agent regarding the addition of silverware coverage

to his policy, that the coverage had appeared on his statement, and that he had contacted Allstate in order to have the coverage removed. Finally, Breitzke obtained a statement from Eva Tolnai, who indicated that she had not requested the silverware coverage that appeared on her policy, that she did not own the type of silverware listed, and that she had contacted Kaniff in order to have the coverage removed.

Corporate Security Investigator Larry Downes reviewed the information compiled by Breitzke in preparation for an interview of Kaniff on December 12, 1990. The day before that interview, Downes made a follow-up call to Clarence Tognarini, who in a recorded conversation confirmed what he had told Breitzke. Tognarini also clarified for Downes that neither he nor his wife had spoken to Kaniff before the silverware coverage had appeared on their policy. On December 12, Downes reviewed with Kaniff the Tognarini incident and the other incidents reported by Breitzke. Kaniff had no real explanation for what the insureds had told the investigators other than that he may have made a mistake in submitting the paper work given the volume of "capturing" calls he had made. Kaniff insisted, however, that he had contacted each insured for whom silverware coverage was added.

Duffy then reviewed the information compiled by Breitzke and Downes, including a transcript of Kaniff's interview, and submitted a written report to Chicago Metro Regional Vice President Claudia Burns. After outlining the results of Corporate Security's investigation, Duffy provided the following assessment of Kaniff's interview:

> He could not satisfactorily explain how nine of ten policyholders did not have any silverware, the specific silverware which he added to the policies or why he had added silverware to the policies of five customers who stated they had not been contacted by him. The explanations provided by Kaniff were not credible.

(R. 66, Tab C, Ex. 7 at 3.) Duffy observed that the weight of the evidence supported the conclusion that Kaniff had falsified information in order to capture unrepresented customer accounts. Because such conduct violated the R–830 agreement, Duffy believed it would support Kaniff's discharge. (*Id.*)

Burns received Duffy's report on December 19, 1990, and upon reviewing it, thought that Kaniff "was probably done being an agent." (R. 66, Tab B at 69.) She agreed that the evidence compiled by Corporate Security would support Kaniff's termination, but she delayed any action in response to the report because it was the holiday season and she hoped that Kaniff would choose to retire. Toward that end, Burns told Territorial Sales Manager Jim Watson that it would be best if Kaniff retired and saved himself the personal embarrassment of being terminated. By the time Burns made that statement, she had decided that if Kaniff did not retire, she would approve his discharge. Watson thereafter telephoned Kaniff at home, telling him that he was in "a lot of shit" and that he should seriously consider retiring.

Having heard nothing from Kaniff by January 8, 1991, Burns was prepared to approve his termination. She asked Rathe to prepare the necessary materials for her approval, and once she signed off on the recommendation, she forwarded those materials to Allstate's home office for the required corporate approvals. Those approvals were in place by February 14, 1991, and they were received in the Chicago Metro Region office on February 18.

After his telephone conversation with Watson, meanwhile, Kaniff contacted Rathe to inquire about his status. Rathe indicated only that there were some "concerns" about Kaniff's account capturing activity. Kaniff asked Rathe for copies of certain documents that had been referenced at his December 1990 Corporate Security interview. Rathe apparently told Kaniff that he would provide those documents. Yet when the documents were not forthcoming, Kaniff renewed his request in writing, specifying that he wished to have a copy of the audio cassette as well as a transcript of the interview, his Allstate employment contract and ethics statement, and a copy of the charges against him. Rathe forwarded the requested materials on February 12, 1991, but noted that no "charges" had been brought against Kaniff. Rathe stated, however, that the company was

concerned about the integrity of the information Kaniff had provided in adding silverware coverage to certain unrepresented accounts. Upon receiving Rathe's letter, Kaniff contacted him to inquire whether the two should meet in light of the fact that there were no "charges" pending. Rathe assured Kaniff that there were no charges and that there was no need for a meeting.

Fearing that he may be fired or forced to retire, Kaniff began to suffer from depression in early January 1991, and he therefore stopped coming to work. On February 26, Kaniff's physician certified that he was totally disabled for the time being, but that a fundamental or marked change was expected in the future. Kaniff returned to work for a few days in March 1991 and was told of the need for a meeting to discuss his employment status. He again became anxious and depressed and was unable to continue working. On June 11, 1991, Kaniff exhausted the "illness allowance" benefits he had been receiving from Allstate and was then placed on a medical leave of absence. It was not until April 1993 that his physician found Kaniff able to return to Allstate full-time. Kaniff therefore returned to the office on May 3, 1993, and was told the following day that his employment was being terminated.

Kaniff elected to appeal the termination decision to a five-member Agent Review Board in accordance with the terms of his employment agreement. In connection with that appeal, Kaniff made an oral and written presentation to the Review Board, arguing that the number of errors identified by the company was small in relation to the number of accounts he had serviced. Kaniff also asked the Review Board to take account of his overall employment record and years of service with Allstate. After considering those arguments, the Review Board voted to uphold Kaniff's termination. Given the amount of time that had passed since the initial approval of the termination decision (over two years due to Kaniff's medical leave), the decision was again routed through Allstate's home office for approval. After a vice president of human resources recommended "job-in-jeopardy" status rather than termination, a Senior Officer Review Panel

was convened to conduct a further review. That panel ultimately upheld the decision to terminate Kaniff's employment, and this lawsuit ensued.

## II.

The district court found that Allstate was entitled to summary judgment on both the age discrimination and breach of contract claims. On the discrimination claim, the court found that Kaniff had been unable to show that Allstate's stated reason for his termination—the falsification of documents in connection with account-capturing activity— was a pretext for discrimination. On the contract claim, however, the court's opinion is somewhat oblique. The court entered judgment for Allstate on that claim, but in its opinion, the court never explicitly construed the disputed language in the R–830 agreement. As a result, the court's analysis of the contract claim can only be implied from the result reached. Although the district court should have explicitly construed the R–830 agreement in granting summary judgment for Allstate on that claim, we need not remand to enable it to do so because the construction of disputed language in an employment contract presents an issue of law for the court to decide. *Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1408 (7th Cir. 1994); *Arrow Master, Inc. v. Unique Forming, Ltd.*, 12 F.3d 709, 713 (7th Cir.1993). Even if the lower court had construed the disputed contract terms, we would have reviewed its interpretation de novo. *GNB Battery Tech., Inc. v. Gould, Inc.*, 65 F.3d 615, 621 (7th Cir.1995). As a result, we may proceed to construe the contract in the first instance. On both the age discrimination and breach of contract claims, we review the district court's award of summary judgment to Allstate de novo, construing the facts in the light most favorable to Kaniff and according him the benefit of all reasonable inferences to be drawn from the evidence. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). Because our assessment of the age discrimination claim will impact our analysis of the breach of contract claim, we begin there.

## A.

The standards applicable to the grant of summary judgment in an employment discrimination case are well established and do not bear repeating. Suffice it to say that in response to Allstate's motion, Kaniff was required to come forward with evidence from which an inference of age discrimination could be drawn. *E.g., Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1402 (7th Cir.1996); *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). He could do that by presenting direct evidence of discrimination, which of course would create such an inference directly, or by showing that his employer's stated reason for the challenged employment decision was false, which would permit us to draw an inference of discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fuka,* 82 F.3d at 1402, 1404; *Weisbrot v. Med. College of Wisconsin,* 79 F.3d 677, 680, 682 (7th Cir.1996). Kaniff argues that his evidence is sufficient to permit an inference of age discrimination under either method of proof, but we are unable to agree with that assessment of the summary judgment record.

For his direct evidence of age discrimination, Kaniff points to the initial reaction of two Allstate officials to the December 1990 report compiled by Corporate Security Manager Jim Duffy. Duffy's report concluded from the weight of the evidence compiled during Corporate Security's investigation that Kaniff had falsified information in order to capture unrepresented customer accounts. The report observed, moreover, that the evidence would support Kaniff's discharge. Chicago Metro Regional Vice President Claudia Burns, to whom the report was directed, apparently delayed any action in response to the report in the hopes that Kaniff would retire. She raised the issue with Allstate Territorial Sales Manager Jim Watson, who supervised Kaniff's immediate supervisor, telling Watson that it would be best if Kaniff retired, thereby saving himself the personal embarrassment of termination. Watson relayed that thought to Kaniff, telling him that the situation was serious and that he should consider retiring.

In the circumstances of this case, the suggestion of retirement does not rise to the level of direct evidence of age discrimination. It is undisputed that Burns made that suggestion, which Watson relayed to Kaniff, only after having reviewed the Corporate Security report detailing the evidence of dishonesty that had been compiled. This was therefore not a situation in which an employee in the protected age group was hounded about retirement despite evidence of adequate performance. In that circumstance, repeated references to retirement may permit a jury to infer discrimination, as the comments may reflect the employer's intention to rid itself of older workers by subtly pressuring them into retiring. *See Greenberg v. Union Camp Corp.,* 48 F.3d 22, 28–29 (1st Cir.1995); *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1108, 1112 (9th Cir.1991); *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 601 (D.Me.1994); *cf. Woythal v. Tex–Tenn Corp.,* 112 F.3d 243, 247 (6th Cir.1997). Here, however, the suggestion of retirement was made only after Allstate had compiled information suggesting that Kaniff had falsified company documents. It appears, in fact, that the possibility of retirement was raised by Allstate officials only in order to spare Kaniff the embarrassment of being terminated for dishonesty. In that circumstance, Allstate's suggestion of retirement would not alone give rise to an inference of discrimination; Kaniff would also be required to show that the identified deficiency in his work performance was pretextual. *See Colosi v. Electri–Flex Co.,* 965 F.2d 500, 502 (7th Cir.1992); *see also Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1394 (6th Cir. 1993). We must therefore consider whether Kaniff did that here.

In attempting to show that Allstate did not rely solely on his alleged dishonesty in deciding to terminate his employment, Kaniff compares the company's response in his case to its reaction in cases where younger insurance agents had been accused of falsifying documents. He asserts that Allstate's more benevolent treatment of these younger agents

**264**

supports an inference that age played an important role in his own case. *See Troupe,* 20 F.3d at 736 (evidence that younger employees otherwise similarly situated to the plaintiff received systematically better treatment would support inference of age discrimination). Yet Allstate disputes that the other cases cited by Kaniff can be likened to his own. It asserts that the acts of dishonesty by the agents in those cases either were less serious than Kaniff's account-capturing activity, or that the charges of dishonesty were never proven to the company's satisfaction. Allstate believes, in short, that different circumstances justified the differing treatment and that Kaniff's evidence does not warrant an inference of age discrimination.

■ Kaniff first cites Allstate's treatment of Michael O'Brien, a thirty-seven-year-old agent who admitted that he had falsified a single insurance application in 1991. The insurance policy in question had been issued in August 1990 and covered two automobiles. When the insured had an accident with one of the automobiles six months later and submitted a claim to Allstate, O'Brien realized that the automobile involved was not adequately covered under the policy because of an error he had made on the insured's application. In order to conceal the error, O'Brien altered the original application and submitted it to Allstate's Claims Department as the original. Yet Claims Department officials soon raised questions about the application, and O'Brien ultimately admitted that he had altered it. He told Corporate Security that he had done so because he feared that the insured's claim would come out of his own pocket. In summarizing the results of his investigation, Corporate Security Manager Duffy opined that O'Brien's conduct would "support serious discipline up to, and including, his discharge." (R. 87, Tab 1, Ex. A.) That was a more lenient recommendation than the recommendation given in Kaniff's case ("the evidence will support [Kaniff's] termination"). In light of the more lenient recommendation, the fact that O'Brien's misconduct was limited to a single incident, and the fact that O'Brien had admitted to falsifying the application, Allstate decided not to terminate O'Brien's employment but to place him on "job-in-jeopardy" status.

■ In 1993, another younger insurance agent, Marla Fox, was investigated for falsifying prior carrier information on automobile insurance applications. Allstate required that customers have at least one year of prior insurance coverage in order to qualify for automobile insurance. After Corporate Security received an anonymous letter alleging that Fox had falsified prior carrier information to enable unqualified applicants to obtain coverage, it conducted an audit of Fox's accounts and identified eight applications containing suspect information. It turned out that three of the eight applications had been completed properly, but Corporate Security still had concerns about the remaining five. The insureds were interviewed and apparently told Corporate Security that they had not provided Fox with the information listed on their applications. Yet Fox maintained that she had written on the applications exactly what the insureds had told her. Corporate Security initially recommended discharge but later changed its recommendation to "job-in-jeopardy" status because it was unable to conclusively determine whether the insureds or Fox had provided the false information. Allstate stressed to Fox, however, that even if the insureds had provided her with false information in order to obtain insurance, it was her responsibility to attempt to verify the accuracy of the information before submitting it.

Finally, Kaniff cites the case of Barbara Harmon, another younger agent who also was alleged to have falsified prior carrier information on automobile insurance applications. Harmon's problems began when Allstate discovered that she had submitted applications for separate customers that listed the identical prior insurance information. Corporate Security turned up additional instances of suspect information in investigating that incident and, based on the information it had compiled, recommended that Harmon be terminated. Yet Harmon then succeeded in rebutting many of the charges leveled against her, and Allstate came to question the reliability of the information it had received from other insurance companies, as well as the credibility of the cus-

tomers whose applications were at issue. Because information that had appeared credible to Allstate during its initial investigation had become more suspect upon further review, the company decided to place Harmon on "job-in-jeopardy" status rather than to terminate her employment.

We agree with Allstate that even when the record is construed in the light most favorable to Kaniff, the company's treatment of these younger agents does not raise an inference that age played a role in Kaniff's termination. It is clear that O'Brien's case is not comparable to Kaniff's because O'Brien was accused only of a single instance of misconduct that had the primary effect of benefitting his customer, rather than O'Brien himself. Allstate thought it significant, moreover, that O'Brien had admitted to the misconduct when confronted with it. The evidence relating to Fox and Harmon is somewhat more analogous to that in our case, however, as each of those agents also was accused of multiple acts of dishonesty. Yet after Allstate's investigations were completed, the company could not determine whether its customers or the agent had been dishonest, as both had an incentive to provide false prior insurance information—the customers in order to obtain insurance for which they were otherwise ineligible, and the agent in order to obtain additional customers. In that circumstance, Allstate apparently thought it prudent to exercise a degree of caution before terminating Fox or Harmon on the ground that either had deliberately falsified information on customer applications.

Kaniff's customers, on the other hand, seemingly had no incentive to provide him with false information relating to their silverware. Each of the unrepresented customers Kaniff contacted already had an Allstate homeowner's policy and could easily have added silverware coverage had they chosen to do so. After interviewing those customers, Corporate Security determined that many had not requested silverware coverage, but that Kaniff had added the coverage himself (sometimes without even talking to the customer) in order to capture the customer's account. As we said, the insureds in this circumstance had little or no incentive to lie about what they did or did not tell the agent, and Kaniff has never suggested that the customers were not being truthful. Corporate Security Manager Duffy instead concluded that Kaniff's explanation when confronted with the problem was not credible. In Kaniff's case, then, Allstate was not left in the same quandary over who was telling the truth that characterized its investigations of Fox and Harmon. As a result, the company had a reasonable basis for imposing a more severe sanction in Kaniff's case, and its decision to do so does not give rise to the inference that Kaniff was treated differently on account of his age. *See Fuka,* 82 F.3d at 1405–06.

Because Kaniff has been unable to show that the stated reason for his termination was false, in the sense that it had no basis in fact or was not the actual reason for the discharge, he failed to satisfy his burden of establishing that the stated reason was a pretext for unlawful age discrimination. As a result, the district court properly entered summary judgment for Allstate on that claim.

### B.

Kaniff's remaining claim is that Allstate breached the R–830 agreement by terminating his employment without providing him prior notice and an opportunity to cure the performance deficiency as the agreement requires. (*See supra* at 2.) Allstate contends that the agreement did not require prior notice in this case because the company terminated Kaniff for "acts of dishonesty," which under the simultaneously-executed amendment to the employment agreement are specifically excluded from the prior notice provision. (*See id.*).

The same provisions of the R–830 agreement at issue in this appeal were recently construed by this court in *Hudson v. Allstate Ins. Co.,* 93 F.3d 296 (7th Cir.1996). There, we rejected the contention that the prior notice required in the event of "unsatisfactory work" could be read as imposing a "good cause" requirement for any termination:

We find nothing in the contract that limits Allstate's underlying right to termi-

nate for any reason at all except the unsatisfactory performance ground listed at the beginning of Section XI. The fact that the agreement goes out of its way to specify that notice is not required if the basis of termination is a criminal or dishonest act (as opposed to any myriad of other reasons that do not amount to "unsatisfactory work," but are neither criminal nor dishonest) cannot be translated into a general rule requiring Allstate to demonstrate that its reason for termination qualified as "good cause" in all cases. Employers may need to move quickly when criminal or dishonest activity is involved, which would explain why the agreement goes out of its way to negate any inference of a notice rule in those cases.

*Id.* at 300. Under *Hudson*'s interpretation of the R830 agreement, then, Allstate was not required to comply with the prior notice provision so long as it was terminating Kaniff for any reason other than "unsatisfactory work."

In response to *Hudson*, however, Kaniff argues that Allstate is attempting to avoid the notice requirement by characterizing a performance-based problem as an "act of dishonesty." In that regard, Kaniff seizes upon the following statement in *Hudson:*

> Since the contract gives extra protection for employees who are charged with unsatisfactory work, it would be possible in a different case to have a genuine issue of fact relating to the ground of dismissal, where the employee argued it was actually for unsatisfactory work and the company claimed it was for another reason. A company cannot avoid its contractual responsibilities for performance-related dismissals merely by invoking some other reason and reciting the employment-at-will doctrine.

■ *Id.* at 301. In this case, as in *Hudson*, however, it is undisputed that Kaniff was not terminated for what the company perceived to be "unsatisfactory work." The record plainly reflects Allstate's belief that Kaniff had engaged in "acts of dishonesty" by adding silverware coverage to the homeowner's policies of unrepresented Allstate customers in order to capture their accounts. Indeed, we found in considering Kaniff's age

discrimination claim that he was unable to raise a disputed issue of material fact as to whether the reason proffered by Allstate (falsification of company documents) was the actual reason motivating the discharge. This is not the case to which we alluded in *Hudson*, then, where a jury must be permitted to decide whether the stated reason is a pretext for a performance-based discharge.

Kaniff advances one final argument in attempting to salvage his contract claim. He asserts that the R–830 agreement does not provide Allstate with discretion to determine whether an "act of dishonesty" occurred; rather, if Allstate wishes to terminate an employee for that reason, it must demonstrate in court that the employee engaged in dishonesty. In that regard, Kaniff contends that even if Allstate may believe that he intentionally falsified documents in adding silverware coverage to existing policies, it is not undisputed that he actually did so because there is evidence from which a jury could find that he merely made mistakes on the relevant documents. Unfortunately for Kaniff, that argument, too, cannot be squared with our interpretation of the R–830 agreement in *Hudson. See* 93 F.3d at 300. We held there that Allstate may terminate an agent without complying with the notice provision "for any reason at all except the unsatisfactory performance ground." *Id.* Because it is undisputed that Allstate did not terminate Kaniff for unsatisfactory work, the company was required to do nothing further under the contract.

### III.

Having reviewed all of the evidence in the light most favorable to Kaniff, we conclude that the district court properly entered summary judgment for Allstate on Kaniff's age discrimination and breach of contract claims.

AFFIRMED.