In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1209

RODNEY WAYNE SPATH,

Plaintiff-Appellant,

v.

HAYES WHEELS INTERNATIONAL-INDIANA,
INCORPORATED,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:98-CV-0045--William C. Lee, Chief Judge.

Argued September 15, 1999--Decided May 1, 2000

Before CUDAHY, COFFEY, and EASTERBROOK, Circuit
Judges.

COFFEY, Circuit Judge.  From 1987 to 1997, Rodney
Spath was a production worker for the Hayes
Wheels International-Indiana, Incorporated (Hayes
Wheels or employer) facility in Huntington,
Indiana. On March 11, 1997, Hayes Wheels
terminated Spath's employment because Spath filed
a false worker's compensation claim. Thereafter,
Spath filed suit against Hayes Wheels in the
Northern District of Indiana, alleging that Hayes
Wheels terminated him, not because he filed a
false worker's compensation claim, but because of
his epileptic disorder, in violation of the
Americans with Disabilities Act (ADA), 42 U.S.C.
sec.sec. 12101-12213./1 The trial judge
concluded that Spath failed to establish a prima
facie case of disability discrimination and
granted Hayes Wheels' motion for summary
judgment. We affirm.

I.  BACKGROUND

A.  Spath's Disabilities
     During his tenure at Hayes Wheels, Spath
suffered at least eight epileptic seizures at his
place of employment, and he concedes that Hayes
Wheels accommodated his epileptic condition for
nine years by transferring him to positions which
involved less contact with machinery and

routinely permitting him to return to work after receiving a physician's release. This all changed, according to Spath, after he had a seizure while on the job and was conveyed to a hospital on August 7, 1996. After this seizure, Spath received a release from the emergency room physician and attempted to report back to work the same day. But his employer refused to accept the emergency room physician's release and, insisted upon a release from Spath's personal physician, Dr. Matthew. On August 8, 1998, Spath provided a release from his personal physician, and again Hayes Wheels refused to accept this release; on this occasion Hayes Wheels demanded a release from Spath's neurologist, Dr. Stevens./2 After Spath became aware that he would be unable to obtain an appointment for a consultation and examination with Dr. Stevens prior to October 14, 1996, he negotiated with his employer to permit him to return to work earlier. On August 18, 1996, Hayes Wheels permitted Spath to return to work, but refused to allow him to work any overtime until such time as he presented a release from his neurologist./3

Spath also argued, in support of his contention that his employer no longer wished to accommodate his disability, that Hayes Wheels restricted his overtime after a seizure on December 5, 1996, without any medical opinion stating that it was necessary. After Spath suffered the seizure on December 5, 1996, Spath's supervisor Mike Johnson restricted Spath from working any overtime hours in the future, explaining in an internal memorandum:

Due to the seizure that was experienced the other day by Rodney Spath, I am restricting Rodney to a maximum working day of no more than 8.5 hours until further notice.

I believe that most of the occurrences we see here in the plant seem to come when Rodney is working overtime. I must act on this to protect Rodney's safety.

The significance of this action, Spath argues, lies in the fact that his employer does not impose work limitations unless ordered by a physician, and Spath did not see a physician for the December 5th seizure.

B. Spath's Termination

On January 4, 1997, Spath was working in the Heat Treat Department of Hayes Wheels with fellow employees Mike Shockome and John Helblig when he allegedly tripped, fell backwards onto the burn oven, and injured his back; this injury was not associated with his epileptic disorder. After

determining that Spath was injured, Shockome and Helblig paged the department supervisor Richard Guenin. When Guenin arrived, he interviewed Spath, who informed Guenin that he was sweeping, tripped, and fell onto the burn oven. Based on this information, Guenin completed the "Supervisor's First Report of Injury," writing: "Rod tripped on paint line hinges on a skid and fell into [the] burn off oven." Guenin read Spath what he had written on the Report. Spath then reviewed the Report himself, and signed it. Afterwards, Spath went to the hospital for treatment of his injuries.

Before Spath left the plant on the day of his injury, Guenin gave him a blank "Employee's Incident Report." Spath took this form home with him in order that his wife might assist him in completing it. On his next day of work, January 6, 1997, Spath submitted the signed Employee's Incident Report on which he wrote: "I was sweeping the floor and triped [sic] over a broken edge of duning and fell into the Age Oven hitting my back." Based on this Employee's Incident Report, Hayes Wheels filed a worker's compensation claim on Spath's behalf.

Approximately two months after Spath's accident, employee Ted Johnson informed Hayes Wheels' Safety Manager, Wayne Desai, that Spath was injured while engaged in horseplay. Desai then interviewed Shockome and Helblig who confirmed Johnson's story, explaining that Spath was injured while attempting to catch a ball of duct tape that Helblig threw to him. Both Helblig and Shockome signed written statements which read:

On January 4, 1997, Rodney Spath, John Helblig, and Mike Shockome were back in the heat treat area. During their scheduled work time back there, they started throwing a ball of duct tape to each other. On one of the throws that John sent to Rodney, it went higher than Rodney could catch. Rodney tried to run back and catch the ball and tripped over his own feet and fell backwards onto the age oven.

After interviewing a total of five individuals, each of whom confirmed that Spath was injured while engaged in horseplay, Desai interviewed Spath. Despite the evidence to the contrary, Spath stuck to his original explanation: that he was sweeping when he injured his back. Desai confronted Spath with the statements of Shockome and Helblig, but Spath continued to deny that he was engaged in horseplay at the time he was injured.

Desai provided the results of his investigation to Rachel Wust, a Human Resources Specialist.

Wust testified that, based on the statements of Shockome and Helblig, she believed that Spath was injured while playing with the duct tape ball and not while sweeping. Thus, she was convinced that Spath's claim that he was injured while sweeping was less than truthful. Wust concluded that Spath had violated Plant Rule 5 by filing a false report, and that he ought to be terminated for that violation./4 Wust then consulted with Rick Guernsey, the Plant Manager, and Rick Uecker, another Human Resource Specialist, who both concurred with her decision to terminate Spath.

Because of Spath's violation of Plant Rule 5, Wust placed Spath on suspension without pay beginning February 27, 1997, and scheduled a termination meeting for March 11, 1997, to present Spath with "the results of the investigation and the action that the company had to take based on that information." Wust, Desai, Uecker, Guernsey, Spath, and his wife, Linda, attended. At the meeting, Wust informed Spath that his employment was being terminated effective immediately for providing false information concerning his injury.

C.  Spath's Lawsuit

On February 4, 1998, Spath filed suit against his employer in the Northern District of Indiana, alleging disability discrimination under the ADA, age discrimination under the ADEA, and state law retaliation. On October 26, 1998, Hayes Wheels filed a motion for summary judgment, arguing that Spath failed to present sufficient evidence from which a rational trier of fact could reasonably infer that his employer fired him either because of his disability or because of his age. On December 29, 1998, the trial judge agreed with Hayes Wheels and granted the defendant summary judgment. Spath appeals.

II.  ISSUE

On appeal, Spath argues that the trial court erred in granting summary judgment to his employer because there are genuine issues of material fact regarding whether Hayes Wheels treated him differently from other employees because of his disability./5

III.  ANALYSIS

A.  Standard of Review

We review the trial court's grant of summary judgment de novo. See Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 898 (7th Cir. 2000). Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, admissions, and affidavits, if any, demonstrate that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, we construe all facts in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, the mere existence of an alleged factual dispute between the parties is not sufficient to defeat a motion for summary judgment. See id. at 252. In this case, Spath is required to demonstrate that there exists a genuine issue of triable fact and that there is evidence on which a jury could reasonably find for him. See Wollin v. Gondert, 192 F.3d 616, 620 (7th Cir. 1999).

B.  Spath's Disparate Treatment Claim

The ADA makes it unlawful to "discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. sec. 12112(a). To establish a claim of discrimination under the ADA, a plaintiff must demonstrate: "'(1) that [he was] disabled within the meaning of the ADA, (2) that [his] work performance met [his] employer's legitimate expectations, (3) that [he] was discharged, and (4) that the circumstances surrounding [his] . . . discharge indicate that it is more likely than not that [his] disability was the reason for these adverse actions.'" Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 725 (7th Cir. 1998) (quoting Leffel v. Valley Fin. Servs., 113 F.3d 787, 794 (7th Cir. 1997)).

1. Hayes Wheels' Different Treatment of Helblig, a Non-Disabled Employee

Initially, Spath argues that Hayes Wheels did not terminate Helblig,/6 a non-disabled employee, who also violated Plant Rule 5 by submitting false information concerning Spath's injury. Spath uses this fact to argue that his employer treated a similarly situated, non-disabled employee better than it treated him, and that we should therefore conclude that his employer terminated him because of his disability. See Troupe v. May Dep't Stores, Co., 20 F.3d 734, 736 (7th Cir. 1994).

It is true that Helblig worked with Spath on the day Spath was injured and told Guenin, at the time of the initial investigation, that Spath was injured when he was sweeping. However, it is also the case that Helblig, unlike Spath, recanted his original story after Desai questioned him a second time; Helblig admitted to Desai that he

and Spath were engaged in horseplay and it was that which led to Spath's accident. After Helblig informed Desai that his earlier version of events surrounding Spath's injury was false, Desai prepared a statement, which Helblig signed, in which Helblig again admitted that he had lied to Guenin during the initial investigation of Spath's injury. In contrast, Spath never told any of the investigators of his accident that he was engaged in horseplay until halfway through his termination meeting.

Spath's argument that he and Helblig are similarly situated is misplaced. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[disabled] employees, the plaintiff must show that the 'comparables' are similarly situated in all respects." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (7th Cir. 1992) (emphasis in original).

In our opinion, when reviewing the respective employee histories of Spath and Helblig, it is obvious that they are not similarly situated employees in all respects. Although both employees initially furnished false information to Guenin, the similarities between them end there. Although Helblig also originally gave a false version of events concerning the accident to Guenin, he later rescinded his false statement both by telling Desai the truth and by signing a statement containing an accurate recitation of the facts concerning the accident. Spath, on the other hand, persisted in giving false statements regarding the cause of the accident and his injury until the zero hour, when he finally admitted he was engaged in horseplay at his termination meeting. Furthermore, Spath, unlike Helblig, on two separate occasions falsified written company documents, the Supervisor's First Report of Injury and the Employee Incident Report. In short, Spath and Helblig did not engage in conduct of "comparable seriousness." See id. We hold that Helblig and Spath are not similarly situated employees and, therefore, no discriminatory intent can be inferred from the fact that Hayes Wheels did not terminate Helblig. See Kaniff v. Allstate Ins. Co., 121 F.3d 258, 263 (7th Cir. 1997); Mitchell, 964 F.2d at 583 & n.5.

2. Hayes Wheels' Allegedly Different Investigations for Non-Disabled Employees

Spath next attempts to establish discriminatory intent from his employers' comparatively more lenient investigations of non-disabled employees accused of falsifying company records in violation of Plant Rule 5. Spath argues that the court "erred in not allowing discriminatory

inferences to be drawn from these investigations which were without purpose, clandestine and scripted for Spath and purposeful and open for non-affected employees." Spath, however, offers no more than bare accusations in his brief that Hayes Wheels engaged in different methods of investigation for disabled and non-disabled employees. As we have repeatedly stated, "[i]t is not this court's responsibility to research and construct the parties' arguments." United States v. Lanzotti, 205 F.3d 951, 957 (7th Cir. 2000). Where, as here, a party fails to develop the factual basis of a claim on appeal and, instead, merely draws and relies upon bare conclusions, the argument is deemed waived. See Bonds v. Coca-Cola Company, 806 F.2d 1324, 1328 (7th Cir. 1986) (citing Morgan v. South Bend Community School Corp., 797 F.2d 471, 480 (7th Cir. 1986)); see e.g., Gagan v. American Cablevision, Inc., 77 F.3d 951, 965 (7th Cir. 1996) (failure to cite any factual or legal basis for an argument waives it); Bratton v. Roadway Package Sys., Inc., 77 F.3d 168, 173 n.1 (7th Cir. 1996) (argument that is not developed in any meaningful way is waived); Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Bd., 957 F.2d 302, 305 (7th Cir. 1992) (there is "no obligation to consider an issue that is merely raised [on appeal], but not developed, in a party's brief"); United States v. Haddon, 927 F.2d 942, 956 (7th Cir. 1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim [for appellate review]."); United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments . . . are waived . . . ."). Consequently, we need not address this argument any further.

3. Hayes Wheels' Refusal to Allow Spath to Return to Work and Its Reduction of Spath's Overtime Hours

    Finally, Spath attempts to establish discriminatory intent from, what he argues are, changes in Hayes Wheels' medical release policy. First, Spath contends that although Hayes Wheels had routinely allowed Spath to return to work after his seizures during his first nine years with the company with a release from any physician, it ceased doing so after his seizure on August 7, 1996. After this seizure, Hayes Wheels refused to accept a release from either the emergency room physician on duty when Spath appeared for treatment/7 or from Spath's regular physician, Dr. Matthew. Instead, Hayes Wheels told Spath that he could not return to work until he got a release from his neurologist, Dr. Stevens. Spath argues that this conduct was

contrary to Hayes Wheels' medical release practice because, according to him, other employees on medical leave, who do not have a seizure disorder, were uniformly allowed to return to work upon presenting a release from any physician.

Second, Spath argues that in a separate departure from its medical release policy, Hayes Wheels reduced Spath's overtime after his seizure on December 5, 1996, despite the fact that it had not imposed work restrictions, which were not physician-approved, on him in the past.

Spath's allegations that Hayes Wheels' changes in its medical release policy should constitute evidence of discriminatory intent are unconvincing because the undisputed evidence in this case established that Hayes Wheels had a nine-year history of accommodating Spath's epileptic condition and his repeated seizures. It is apparent that his employer was concerned with Spath's safety and wanted to make sure that Spath was fit to return to work after his August 1996 seizure. In order to ensure this, Hayes Wheels, on this occasion, requested that Spath submit a medical release from a neurological specialist, specially qualified to evaluate epileptic disorders, rather than from a general practice physician. Furthermore, although Spath was unable to schedule an appointment with his neurologist for several weeks, Hayes Wheels again accommodated Spath and allowed him to return to work in the interim. In an internal memorandum Hayes Wheels explained its decision to allow Spath to return to work without a release from a neurologist: "Rodney has been set up to see a specialist. A neurologist on Sept. 15th. He has pleaded with us to be able to come back to work. We have agreed to let him return but on day shift and on special projects where we can keep a close eye on him . . . until he can return to your shift with a clean bill of health." Consistent with its internal memorandum, Hayes Wheels allowed Spath to return to work full time, even changing his shift schedule, after the neurologist examined Spath and recommended that he "only work first shift." We are of the opinion that the decision to require a release from a neurologist was justified, especially in this litigious society where Spath and/or other employees may have been injured as a result of one of Spath's seizures after his return to work. Furthermore, Hayes Wheels had, as even Spath concedes, accommodated Spath's seizures for over nine years. Consequently, we refuse to infer any discriminatory intent from Hayes Wheels' decision to request additional medical testing. Cf. Porter v. United States Alumoweld Co., 125 F.3d 243, 245-46 (4th Cir. 1997).

Similarly, Hayes Wheels' restriction of Spath's overtime was justified because Spath's supervisors observed that most of Spath's seizures occurred when he was working overtime. Thus, it was logical to believe that restricting Spath's overtime would, in all probability, reduce his fatigue factor and thus the number of seizures, as well as better ensure Spath's safety and the safety of his fellow employees. When combined with Hayes Wheels' long history of accommodating Spath, we refuse to hold that the restriction of his overtime evinces any discriminatory intent. Cf. Howard v. Navistar Int'l Transp. Corp., 904 F. Supp. 922, 930-31 (E.D. Wis. 1995), aff'd, 107 F.3d 13 (7th Cir. 1997).

Moreover, Spath has failed to demonstrate how the decisions to require a release from a neurologist or restrict his overtime are causally related to his termination, which occurred months later. See Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997) (requiring that a plaintiff making a claim of discrimination "establish 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985)). Because Spath has failed to present any evidence of discriminatory intent, we hold that he has failed to establish a prima facie case of disability discrimination.

IV.  CONCLUSION

We conclude that there is insufficient evidence for a reasonable jury to find that Hayes Wheels terminated Spath because of his epileptic disorder. The decision of the district court to grant summary judgment to Hayes Wheels is

AFFIRMED.

/1 Spath also alleged age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. sec.sec. 621-34, and state law retaliation, but Spath has abandoned those claims on appeal.

/2 A neurologist is an expert in the treatment of disorders of the nervous system such as epilepsy. See Dorland's Illustrated Medical Dictionary, 1130, 566 (28th ed. 1994).

/3 Hayes Wheels offered Spath time off pursuant to the leave provisions of the Federal Medical Leave

Act, 29 U.S.C. sec.sec. 2601-54, until Spath could get the release. But Spath, for reasons unexplained in the record, refused this offer.

/4 Plant Rule 5 provides:

Commission of, or being a party to, the following acts or related acts, will be sufficient grounds for disciplinary action that may include discharge: . . .

5) Falsifying an employment application, misrepresenting or falsifying a leave of absence, writing false statements on medical reports or intentionally giving any false information relating to employment or benefit application.

/5 Spath also makes a failure to accommodate claim, see 42 U.S.C. sec. 12112(b)(5)(A), arguing that his organic brain syndrome, mild mental retardation, and dependent personality disorder--disabilities not involved in his disparate treatment claim--caused him to deny involvement in the horseplay incident because he sometimes does not remember what he was doing or what he might have said in the past. In essence, Spath is asking this Court to extend the ADA so as to prevent an employer from terminating an employee who lies, just because the lying is allegedly connected to a disability. We are of the opinion that the ADA does not require this. See generally Jones v. Am. Postal Workers Union, 192 F.3d 417, 429 (4th Cir. 1999) ("The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability."). We, therefore, decline to give any more consideration to this issue.

/6 Helblig was only given a written warning and advised that if he was ever caught "horseplaying" again he "would have time off." Presumably this means that he would be suspended or fired.

/7 In all probability the emergency room physician had never seen Spath before, and was in no position to have a complete knowledge of his past medical history, including the number of prior seizures, the severity of them, or if Spath suffered any residuals as a result of the seizure episode.