**Emanuel WRIGHT, Plaintiff–
Appellant,**

v.

**EFFICIENT LIGHTING SYSTEMS,
INCORPORATED, Defendant–
Appellee.**

**No. 02–1852.**

United States Court of Appeals,
Seventh Circuit.

Argued March 4, 2003.

Decided April 25, 2003.

938

Before BAUER, EVANS, and WILLIAMS, Circuit Judges.

## ORDER

Starting in July 1997, Emanuel Wright was employed by Efficient Lighting Systems, Inc., an electrical contracting company. Wright, the company's only African–American employee, advanced during his tenure from "helper" to "apprentice" and then from "apprentice" to "leadman." But his ascent through the Efficient ranks was clipped short when Sean Smith, Efficient's owner and president, abruptly fired Wright in February 2000. Suspecting that discriminatory and retaliatory motives lay behind his termination, Wright filed this suit pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Efficient countered with a motion for summary judgment. The district court granted that motion, reasoning that Wright had collected insufficient evidence to prove his suspi-

cions. Reviewing the facts in the light most favorable to Wright, the non-moving party, *see Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir.1999), we arrive at a different conclusion, and thus vacate the district court's judgment and remand the case for further proceedings.

As relevant to this case, our narrative picks up in June or July 1999, when Smith moved Wright from a jobsite where he was the leadman after a new worker complained that "he could not work with Wright." When Wright questioned one of Efficient's managers, Lee Scrogham, about why he had been shifted to another jobsite, Scrogham told Wright that he had seen Wright walking around the jobsite with his "soul brother walk." Wright informed Smith of this conversation, and asked whether the move had been racially motivated. Smith told him it wasn't, and said "not to worry about it" because Smith would talk to Scrogham and had several other jobs Wright could work. Wright continued working as a leadman at these other jobs, although most of the time he was the only Efficient employee at the jobsite.

On January 21, 2000, Wright met with Smith to discuss "his future with the company." Wright felt that other, newer employees were getting choice inside jobs while he regularly had to work outside in cold weather. He also noted that he was often assigned to work under other leadmen, but that other leadmen were not assigned to work under him.

Despite this meeting, on Wednesday, February 2, 2000, Wright was assigned to work under leadman Jay Holycross at the Prism Communications jobsite, where Efficient was installing smoke detectors. Two helpers, Damon Turk and Christine Norris, were also assigned to the job, most of which had already been completed. On Thursday Smith provided Wright a revised blueprint that required Wright to reprogram approximately 25 smoke alarms. At that time, Wright informed Smith that he needed "special boxes" to correctly install the remaining fire alarm strobe lights. Smith told Wright he would call the manufacturer regarding the boxes.

The next day, leadman Holycross issued job assignments and left the jobsite. Wright spent the morning installing ceiling smoke detectors and waiting to hear back from Smith. At about 10:30 a.m., Wright contacted Smith to check the status of the boxes; Smith said he had forgotten to call the alarm company but that Wright should "stand by" and Smith would get back to him. Wright, Turk, and Norris then took lunch.

When they returned to the job, Wright still had not heard from Smith. Unable to proceed with installing the fire alarm system without the boxes, Wright suggested that Turk and Norris clean up materials in a back room; he could not order them to do so because he was not the leadman on the job. Norris declined to accept this assignment and went home. Turk stayed on the job but simply played a cell-phone computer game.

Wright, on the other hand, continued working. He reviewed the new blueprints, confirmed that necessary installation equipment was at the jobsite, familiarized himself with the fire alarm installation procedures, and identified several areas where already-installed components did not comply with the revised blueprints. He also fielded questions from workers at another job where he was leadman.

Still not having heard from Smith, Wright finally called him again around the 3:30 p.m. quitting time. He told Smith of the improperly installed components he had identified, and informed Smith that he was unfamiliar with some of the installa-

tion equipment and would need to be trained. Wright also said that he needed to speak with Smith regarding Turk and Norris's refusal to clean the back room. Smith and Wright scheduled a Monday morning meeting to address these issues.

Later that same day, however, Smith received a call from Mike Meharg, the project manager for the general contractor at the Prism site. Meharg, according to Smith, was "very upset and indicated that the crew that I had on site had not performed any work all afternoon." Meharg told Smith his crew had "sat around and read the newspaper all afternoon," and that Meharg wanted a new crew on site Monday so that the fire alarm system would be installed on time. Although Smith knew that contractors commonly made such demands, Meharg's company was a very good Efficient customer and Meharg was "mad."

Endeavoring to find out what had happened that afternoon at Prism, Smith called Turk at home. Turk told him that he and Wright had not done any work that afternoon and that Wright had given Norris permission to go home. Smith then called Wright to get his side of the story. Wright denied Meharg's allegations, but told Smith that he could not speak at that time because he was preparing dinner for his family. Smith agreed to discuss the allegations at their previously scheduled Monday meeting.

Wright and Smith met on Tuesday rather than Monday. By that time, however, Smith had already decided on a course of action. Without allowing Wright to make his case, Smith produced a copy of Efficient's Information Handbook for Employees and cited a rule prohibiting "deliberate interference with or delaying or restricting of production or the production of others." Violators of this rule could either be sus-

pended or fired; Smith opted for the latter.

Several months later, Wright responded with this suit, alleging, as relevant here, discriminatory and retaliatory discharge. In granting Efficient's summary judgment motion, the district court exhibited a dim view of these allegations. The court first noted that Wright had not produced direct evidence of discriminatory discharge. Then the court examined whether Wright had satisfied the four elements of *McDonnell Douglas Corp. v. Green's* burden-shifting approach to establishing a prima facie case of discrimination, *see* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (plaintiff can establish prima facie case by demonstrating that he or she 1) is a member of a protected class, 2) who was meeting his or her employer's legitimate expectations, 3) but who suffered an adverse employment action, 4) not inflicted on a similarly situated employee outside the protected class). Assuming the first three elements, the district court decided that Wright had not identified a similarly situated employee of a different race who was treated more favorably. Thus, Wright could not establish a prima facie case of employment discrimination. Furthermore, the district court held that even if Wright could establish a prima facie case, and thus shift to Efficient the burden of enunciating a race-neutral reason for firing him, he could not prove that Efficient's stated reason—Smith's belief that Wright had performed no work that Friday afternoon—was a pretextual lie masking discriminatory motives.

The district court also found wanting Wright's claim that he had been discharged in retaliation for his complaints at the January 21, 2000, meeting with Smith. For summary judgment purposes the court assumed that Wright had demanded race-neutral treatment at that meeting—demands protected by antidiscrimination

laws and thus unlike simple griping about job assignments. It then reasoned that the mere temporal proximity of the meeting and Wright's firing did not constitute direct evidence of retaliation. The district court also held that Wright could not prove retaliation through the indirect method, which adapts the *McDonnell Douglas* framework to the retaliation context. Although the district court assumed that Wright had established a prima facie case of retaliation under this method, the court reiterated its view that he could not disprove Smith's stated reason for firing him, i.e., that Smith believed Wright had not performed any work at the Prism jobsite on the preceding Friday afternoon. Thus, the court held, Wright could not establish retaliation indirectly.

On appeal, Wright challenges all these conclusions. He first contends that he satisfied the fourth prong of *McDonnell Douglas* in two ways: 1) he offered evidence that—contrary to Smith's stated reason for firing him—he did indeed perform work that Friday afternoon at Prism; and 2) he identified a similarly situated white employee who was treated more favorably. Then he argues that he established a retaliation claim because Smith must have known that he worked that Friday, and therefore Smith's stated reason for firing him was pretext. We address these arguments out of turn because the first and third are really almost identical attacks on the district court's pretext ruling; they thus logically follow the second, which attempts to establish Wright's prima facie case. *See Jones v. Union Pac. R.R.*, 302 F.3d 735, 741–42 (7th Cir.2002) (prima facie case is condition precedent to pretext analysis, but order may be adapted to fit particulars of case). For simplicity's sake and because they are analyzed under the same rubric, we also consider Wright's § 1981 and Title VII claims simultaneously. *See Alexander v. Wis. Dep't of Health and Human Servs.*, 263 F.3d 673, 681–82 (7th Cir.2001).

■ Contending that he has identified a similarly situated white employee who was treated more favorably than he, Wright points to Allen Reddick, who like Wright worked as a leadman and reported directly to Smith. Reddick, the parties agree, falsified a worker's compensation claim but was not fired. Wright argues that he and Reddick are similarly situated because falsifying a worker's compensation claim is listed in Efficient's handbook in the same offense category as the offense for which Wright was terminated, indicating that both offenses have similar culpability levels.

Despite the apparent similarities between their situations, the district court concluded that Wright and Reddick are not similarly situated because Reddick ultimately admitted his misconduct and agreed to repay the falsified claim. Wright, on the other hand, denied that he had failed to work when Smith called him at home. In reaching its conclusion that Reddick's acceptance of responsibility distinguished his situation from Wright's, the district court relied on *Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392 (7th Cir.2000). In *Spath,* an employee was hurt while horse-playing in his employer's factory. He filed a report of the incident claiming to have been hurt while working. Another employee who witnessed the incident agreed. However, the second employee ultimately recanted his false report, and truthfully explained what had happened. The company did not fire him. The company did fire the first employee, who twice previously had falsified company documents and who confessed his misconduct only at the eleventh hour, when it became clear that he would be terminated. In the first employee's discriminatory dis-

charge suit, we held that the second employee's recantation and infraction-free record distinguished him from his coworker such that no discriminatory intent could be inferred from their disparate treatment. *See id.* at 397.

There are several reasons why *Spath* is inapposite to this case. First, in *Spath* there was no question that the plaintiff had in fact engaged in misconduct. Here, whether Wright performed work at Prism remains a central contested issue. Second, in *Spath* both employees were given equal opportunities to explain their version of events. *See id.* at 396–97. Here, Wright was never given a chance to discuss with Smith the allegations against him, as Smith fired him as soon as their Tuesday meeting commenced. This harsh response contrasts with Smith's lenient treatment of Reddick, who confessed only after another employee informed on him but who was still allowed to work a deal to retain his job. Finally, unlike the two employees in *Spath,* Reddick and Wright apparently had identically clean disciplinary records.

Efficient also contends that Reddick's and Wright's offenses are vastly dissimilar because Wright's offense—slowing down production at a jobsite—adversely affected Efficient's professional relationship with a long-time customer, whereas Reddick's false worker's compensation claim had no such direct negative repercussions on Efficient's professional reputation. As *Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 289 (7th Cir.1999), makes clear, however, these arguments are not appropriate for summary judgment. In *Stalter,* defendant Wal–Mart claimed in a motion for summary judgment that a black employee's stealing was dissimilar from a white employee's lying, even though both offenses were classified as "gross misconduct." We rejected this claim, concluding that where two employees commit "gross misconduct" but only one is fired, the defendant must explain this discrepancy to the jury (absent a non-pretextual rationale). *Id.* Here, both Reddick and Wright–two leadmen with clean records–were charged with offenses in the same offense category, yet only Wright was fired. Wright has therefore established a prima facie case.

Additionally, our de novo review of the summary judgment evidence also leads us to conclude that both Turk and Norris—the two white employees who indisputably failed to work at Prism but who were not fired—were similarly situated to Wright. Efficient contends that Wright's situation differs from these employees because Wright was a supervisor, and they only helpers under his direction. But Wright counters that he was not working in a leadman capacity at Prism, and consequently had no supervisory role or authority at this jobsite. Because Wright is the non-moving party, we must assume that his version is true, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and regardless it seems fairly clear from the record that Holycross was the sole supervisor at Prism. Wright, like Turk and Norris, received his assignments from Holycross and, again like Turk and Norris, had to give Holycross his time-card in order to get paid for his work. Thus, Turk and Norris are similarly situated to Wright.

Wright's identification of similarly situated white employees who were treated more favorably than he established his prima facie case and shifted to Efficient the burden of enunciating a non-discriminatory reason for his termination. The company has carried this burden: Smith claims to have fired Wright because he believed that Wright had not performed work at Prism that Friday afternoon. Wright's task, then, is to cite evidence

from which a jury could infer that Smith's reason was not only false but also a cover for racial discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Jones,* 302 F.3d at 742–43 (Where a defendant-employer has come forward with a non-discriminatory reason for an employment action, a plaintiff "must produce significantly probative admissible evidence from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory.") (citations and quotations omitted).

In attempting to cast doubt on the honesty of Smith's stated termination rationale, Wright focuses on the telephone call he made to Smith just before Friday's quitting time. Essentially, Wright contends that Smith could not have honestly believed that he had not worked after he provided a detailed description of his afternoon activities. Thus, argues Wright, Smith's motivation in firing him was not what Smith claims. It does appear strange, perhaps unreasonable, that Smith, after telling Wright to "stand-by" while he checked on the parts needed to proceed with the job, would have thought Wright hadn't done *any* work after Wright provided him a fairly detailed accounting of required additional trouble-shooting, equipment, and training. As we have noted, "a determination of whether a belief is honest is often conflated with analysis of reasonableness. After all, the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." *Flores v. Preferred Tech. Group,* 182 F.3d 512, 516 (7th Cir.1999).

On the other hand, rationality is not the *sine qua non* of honesty. Smith, who in deposition claimed not to remember the details of his afternoon conversation with Wright, had received an angry phone call from a valued customer informing him that his crew had "read the newspaper" all afternoon, and then upon investigation received confirmation of the allegation from an on-site employee, Turk. It was Smith's prerogative to believe the customer and Turk over Wright, and the federal courts usually will not second-guess such judgments absent proof of discrimination, no matter how arguably erroneous they might appear. *See Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 677 (7th Cir. 1997) ("[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." (quotations and citations omitted)).

Given our reluctance to act as a "super-personnel" department, we would probably affirm the district court's judgment if apparent irrationality were the only thing causing us to question the motives of Smith's termination decision. But there is something more–Smith's failure to fire both Norris and Turk, white employees who also allegedly failed to work that afternoon at Prism. *See Gordon v. United Airlines, Inc.,* 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination."). Such disparate treatment of similarly situated white employees reinforces the suspicion that Smith's termination decision was not simply and therefore innocently irrational, but rather the product of racial discrimination. Certainly from these facts a reasonable jury could so infer, especially if during cross-examination Smith's claims not to remember his afternoon conversation with Wright were called into question. Summary judgment for Efficient on Wright's discriminatory discharge claim was therefore inappropriate.

Our holding that Wright presented enough evidence to survive summary judgment on the question of pretext also revives his claim that he was fired in retaliation for his complaints at the January 21 meeting. The district court assumed that Wright had stated a viable retaliation claim under the indirect method of proving retaliation adapted from the *McDonnell Douglas* framework. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir.2002). But the court went on to rule that Wright could not disprove Smith's reason for firing him; his retaliation claim thus failed. Wright can, however, prove Smith's reason was pretext, and so the retaliation claim must be reinstated.

Accordingly, we VACATE the district court's judgment and REMAND the case for further proceedings.