**Gary HUDSON, Plaintiff–Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, et al., Defendants–Appellees.**

No. 95–3636.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1996.

Decided Aug. 14, 1996.

theory that he had carried the firearm. *See* 85 F.3d at 60.

Mark D. DeBofsky, Richard Q. Holloway (argued), DeBofsky & DeBofsky, Chicago, IL, for Gary Hudson.

Michael A. Warner, Condon A. McGlothlen (argued), Gloria M. Portela, Kenneth D. Schwartz, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Allstate Insurance Company.

Condon A. McGlothlen, Gloria M. Portela, Kenneth D. Schwartz, for Allstate Life Insurance, Allstate Indemnity Company, Allstate Motor Club, Incorporated, Sears Financial Corporation.

Before POSNER, Chief Judge, and DIANE P. WOOD, Circuit Judge.*

DIANE P. WOOD, Circuit Judge.

After ten years of working as an Allstate Insurance agent, Gary Hudson took a wrong turn. When his office was burgled on Christmas Day, 1991, he submitted claims for recovery both to Allstate, which had issued his homeowner's policy, and to State Farm Insurance, which had issued the policy protecting his business premises. Although Hudson initially informed each company that he had submitted the other claim, he collected for the same items from both companies, and he retained the extra money for approxi-

mately nine months before he remedied the situation. Allstate eventually fired him, which prompted Hudson to bring this suit claiming that his termination was in breach of his agency contract. The district court granted summary judgment for Allstate, and we affirm.

As the district court correctly observed, the essential facts of this case are undisputed. Hudson's relationship with Allstate was governed by the R–830 Agent Compensation Agreement. Because they are critical to the resolution of Hudson's appeal, we set forth the relevant termination provisions of that agreement from Section XI of Part Four:

XI. This agreement will automatically terminate upon your death. Either you or Allstate have the right to terminate this agreement upon mailing to the other, at his or its last known address, written notice of termination ... The Company will not terminate your employment *because of unsatisfactory work* unless you have been notified that your work is unsatisfactory and that your job is in jeopardy and unless you have been given a reasonable opportunity to bring your performance up to satisfactory standards.

In no event shall an employee be released for any reason without the following review and approval procedure having been adhered to:

(1) For employees with less than four years of service, review and approval by the Regional Manager.

(2) For employees with more than four years, but less than ten years service, additional review and approval by the Zone Personnel Manager and the Zone Vice President are required.

(3) For employees with more than ten years service, review and approval in the Home Office by the Personnel Vice President are required in addition to the above.

* Circuit Judge CUMMINGS recused himself after oral argument and did not participate in the decision of this case.

(Emphasis added). Section XI of Part Four also contained a simultaneously-executed rider, which amended it as follows:

> The term "unsatisfactory work" relates to the quality of performance. Notification that your job is in jeopardy is not required in the event of termination of employment for a criminal act or an act of dishonesty, such as, by way of example but not limited to, the following: embezzlement, falsification of any Company or industry plan documents completed or approved by you in the performance of your duties, fraud or misrepresentation of material fact, or forgery....
>
> If this agreement is terminated by the Company, you have the right to a review by the Agent Review Board as set forth in the Agents Procedure Manual, unless such termination is in accordance with the provisions of a Career Foundation Agreement Amendment held by you.

Hudson claims that the language of this agreement means that he could be terminated only for cause, while Allstate argues that it creates only a limited exception, applicable to terminations due to unsatisfactory work, from the normal rule of employment at will followed in Illinois.

We return now to Hudson's history with Allstate, to the burglary of Christmas 1991, and its aftermath, taking these facts exclusively from Hudson's account. Hudson had been a successful Allstate agent, ranked among the top 5 percent of his peers at the company. In keeping with Allstate's requirement that its neighborhood office agents maintain insurance coverage on their business premises, he had insured his office through State Farm—a decision entirely acceptable to Allstate. Hudson also had a homeowners policy written by Allstate, which covered his personal property. One important difference existed between the two policies: the State Farm business policy paid full replacement value for stolen items, while the Allstate homeowners policy (which had a $200 cap on business property coverage) paid only actual cash value.

The 1991 burglary resulted in the theft of both personal and business property: a facsimile machine, computer, VCR, and television that Hudson had purchased for himself, and a typewriter that Allstate had furnished him free of charge. On December 26, 1991, Hudson filed a loss claim for the stolen items, both business and personal, with Allstate under his homeowners policy. The agent informed him that the policy probably would not cover some of the stolen items on the ground that they were business property and that he should therefore also file a claim with State Farm. Following that advice, on the same day he submitted a claim to State Farm for all of the stolen items, including items he had reported to Allstate. He notified each insurer that he was making claims with the other and also told his manager, Arthur Booze. Both Allstate and State Farm registered Hudson's claims with the Property Insurance Loss Registry, a central clearinghouse for insurance claims.

On December 30, 1991, Allstate paid Hudson $3,338.93 on his claim for the stolen computer. It also supplied him with replacements for some of the other property, bringing the total value of Hudson's recovery from Allstate to $4,296.93. On January 7, 1992, a State Farm claims adjuster visited Hudson. Hudson completed a personal inventory form for State Farm, listing the stolen property on January 28, 1992, but he did not inform State Farm that he had already received money from Allstate for some of the same items listed on the inventory form. State Farm then issued a check to Hudson for $7,495.87, which he deposited into his personal account on February 4, 1992. More than nine months later, on November 11, 1992, Hudson delivered a check to State Farm in the amount of $4,296.93, representing the duplicative portion of the payment he had received. Hudson offered two reasons for the tardiness of the refund. First, he claimed that he had trouble contacting the State Farm adjuster to arrange for the reimbursement. Second, he claimed that he believed he had up to one year after the loss settlement to readjust the claim. He also noted that he was distracted by personal problems during 1992, which required him to move from Chicago to Wisconsin. He does not dispute, however, that the delay occurred.

In the meantime, however, Allstate accidentally stumbled upon Hudson's activities. In September 1992, it was investigating allegations that some of its agents were misrating their automobiles. On September 18, 1992, an Allstate agent in Wisconsin reported to Allstate that Hudson had purchased automobile insurance from him listing a Wisconsin address for the cars. Because Hudson's agency was in Chicago, Allstate initiated an investigation into the matter. Hudson was exonerated, because he was living in Wisconsin by then. During the course of this investigation, however, Allstate was reminded of State Farm's business insurance policy on Hudson's office and Hudson's claim for the December 1991 burglary. Allstate learned on October 29, 1992, that Hudson's insurance recovery from State Farm had duplicated the recovery he had received from Allstate. Although this occurred prior to the time when Hudson made his restitutionary payment to State Farm, he asserts that he knew nothing about the investigation until December 22, 1992, and thus that the November 11 payment was entirely voluntary.

Solely because of Hudson's handling of the burglary claim, Allstate decided to terminate his agency contract. In accordance with the second paragraph of Section XI of the agreement, this recommendation was approved by the Human Resources Manager, the regional Vice President, the Corporate Security Officer, the Vice President of Human Resources, and several others. On March 2, 1993, Allstate informed Hudson that his employment was terminated. He received written notification of his termination in letters mailed March 15, 1993, and March 19, 1993. Finally, Allstate offered Hudson the opportunity to have his case reviewed by the Agent Review Board mentioned in the second paragraph of the amendment to Section XI, but he declined the offer. Instead, he filed an action in Wisconsin state court against Allstate Insurance Company, Allstate Life Insurance Company, Allstate Indemnity Company, Allstate Motor Club, Inc., and Sears Consumer Financial Corporation. The case was removed to federal court and transferred to the Northern District of Illinois, where the defendants moved for summary judgment. The district court concluded that only the legal issue of contract interpretation remained to be decided, and it resolved that question against Hudson in a summary judgment order of October 25, 1995, which dismissed the action against all defendants with prejudice.

■ Neither party has challenged the district court's conclusion that Illinois law governs this diversity case. Like virtually all states, Illinois follows the rule that "an employment relationship without a fixed duration is terminable at will by either party." *Mitchell v. Jewel Food Stores,* 142 Ill.2d 152, 154 Ill.Dec. 606, 614, 568 N.E.2d 827, 835 (1990); *Duldulao v. St. Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 106 Ill.Dec. 8, 11–12, 505 N.E.2d 314, 317–18 (1987). In order to overcome that presumption, we must find evidence in the contract that shows that the parties intended to require Allstate to prove good cause for Hudson's termination. The language "must contain a promise clear enough that an employee would reasonably believe that an offer has been made." *Duldulao,* 106 Ill.Dec. at 12, 505 N.E.2d at 318. In carrying out this task, we are bound by the plain language of the contract, unless we find that it is ambiguous enough to require additional factfinding. *Baker v. America's Mortgage Servicing, Inc.,* 58 F.3d 321, 326 (7th Cir.1995); *Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990).

■ The Allstate agency contract contains elements of both employment at will and a limited promise of greater protection. In general, it provides that either party can terminate the agreement simply by mailing notice of termination to the other: a classic employment at will arrangement, with no fixed duration at all. It then spells out one exception to this rule. If Allstate wants to terminate "because of unsatisfactory work," the agent is entitled to pretermination notification that his or her work is unsatisfactory and to an opportunity to bring it up to satisfactory standards. Finally, the contract promises that no employee will be released for any reason unless Allstate observes certain pre-termination review and approval procedures, which Hudson concedes it fol-

lowed here. The amendment to Section XI quoted above goes on to define the term "unsatisfactory work" and to specify certain causes for termination that do not trigger the notification rule, including an act of dishonesty, such as fraud or misrepresentation of material fact.

Hudson argues that we should read these contractual provisions to mean that he could only be involuntarily terminated for cause. If the cause was unsatisfactory work performance, then he was entitled to pre-termination notice and an opportunity to cure the problem; if the cause was the commission of a criminal or dishonest act, even though the contract did not require notice, he argues that Allstate nonetheless had to demonstrate that such an act occurred (i.e. prove cause in court) to avoid a finding of breach of contract. This is the approach that a district court in the Northern District of California recently took when it construed the same clause that is before us. See *Morales v. Allstate Insurance Co.*, 1995 WL 616654 (N.D.Cal., Oct. 13, 1995). Otherwise, Hudson argues, the company could avoid the contractual requirements for performance-based dismissals by the simple expedient of labeling them an act of dishonesty. Finally, Hudson reads *Turner v. Allstate Insurance Co.*, 902 F.2d 1208, 1209 (6th Cir.1990), as a decision "holding" that this contract required good cause for terminations.

Allstate, on the other hand, argues that this language means that unless a termination is for "unsatisfactory work," the company had unfettered discretion to discharge its agents. It contends, relying principally on *Mitchell* and *Duldulao*, that procedural requirements for terminating a written employment contract, such as notice or a promise to conduct internal company review prior to termination, do not transform an "at will" agreement into one terminable only for cause. In the alternative, Allstate argues that if the agreement required good cause for discharges based on unsatisfactory performance, this is its only deviation from the general rule of "at will" terminations. See *Gonzalez v. Allstate Insurance Co.*, No. 87–6101, slip op. at 8 (11th Cir., Nov. 7, 1988), 862 F.2d 877 (table). Finally, Allstate argues

that the undisputed record shows that it had "good cause" to terminate Hudson in any event, and thus that this Court can affirm on that alternative ground. See *United States v. Brown*, 64 F.3d 1083, 1087 (7th Cir.1995).

We find nothing in the contract that limits Allstate's underlying right to terminate for any reason at all except the unsatisfactory performance ground listed at the beginning of Section XI. The fact that the agreement goes out of its way to specify that notice is not required if the basis of termination is a criminal or dishonest act (as opposed to any myriad of other reasons that do not amount to "unsatisfactory work," but are neither criminal nor dishonest) cannot be transformed into a general rule requiring Allstate to demonstrate that its reason for termination qualified as "good cause" in all cases. Employers may need to move quickly when criminal or dishonest activity is involved, which would explain why the agreement goes out of its way to negate any inference of a notice rule in those cases. Although this conclusion places us in disagreement with the California district court's *Morales* decision, we note that the Eleventh Circuit read the contract exactly as we do in its unpublished *Gonzalez* opinion.

Although Hudson argues that *Turner* is to the contrary, we do not read *Turner* as going so far. The Sixth Circuit did not set forth the contractual language it was construing in *Turner*; it simply stated in a conclusory fashion that "[a]mong the terms and conditions of the employment agreement was a provision prohibiting Turner's termination except for 'just cause.'" 902 F.2d at 1209. For all we can tell, the contract that Turner had signed was different from Hudson's and contained a promise not to terminate him except for good cause. That is the basis upon which the Sixth Circuit's decision proceeded. The question decided in *Turner* related to who had the burden of proof to show good cause under Michigan law: the employer or the employee. We therefore find *Turner* to be consistent—or at least not inconsistent—with the result we reach today.

■ Two final points bear mentioning. First, the uncontested facts here show that Hudson was *not* terminated for "unsatisfac-

tory work." Since the contract gives extra protection for employees who are charged with unsatisfactory work, it would be possible in a different case to have a genuine issue of fact relating to the ground of dismissal, where the employee argued it was actually for unsatisfactory work and the company claimed it was for another reason. A company cannot avoid its contractual responsibilities for performance-related dismissals merely by invoking some other reason and reciting the employment-at-will doctrine. Second, the uncontested facts show that Hudson indeed committed an act of dishonesty. He admits that on January 28, 1992, he did not inform State Farm that he received money from Allstate for the very items he listed on State Farm's personal inventory form. He took the check from State Farm for $7,495.87 and cashed it on February 4, 1992, knowing that it was based on the inventory form he had filled out. He did not correct the duplicative payment for nine months, effectively giving himself an interest-free loan for $4,296.92 for that period of time. Whatever the standards the State of Illinois uses for licensing insurance agents, and whatever the related investigation relating to the automobile insurance problems showed, Allstate was entitled to treat this as an act of dishonesty justifying termination of the agency relationship. It makes no difference whether Hudson paid back the money in November because his conscience was weighing on him, or because he had gotten wind of Allstate's inquiries. The key facts are undisputed: he misled State Farm on the inventory form, and he kept the money for nine months.

We therefore AFFIRM the judgment of the district court.