CHRIS LINKER *et al.*, Indiv. and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants, v. ALLSTATE INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)  No. 1—01—2125

Opinion filed July 22, 2003.—Rehearing denied June 13, 2003.

Lawrence Walner & Associates, Ltd., of Chicago (Lawrence Walner and James T. Nyeste, of counsel), Law Offices of Randall J. Wolfe, of Lake Oswego, Oregon (Randall J. Wolfe, of counsel), and Gatti, Gatti, Maier, Krueger, Sayer & Associates, of Portland, Oregon (Daniel J. Gatti, of counsel), for appellants James W. Carson, John Chaney, Jay Flanagan, and Donald Jones.

Sonnenschein, Nath & Rosenthal, of Chicago (Jeffrey P. Lennard, David L. Schiavone, Deborah A. Devaney, and Thomas E. Deer, of counsel), for appellees.

JUSTICE BURKE delivered the opinion of the court:

Plaintiffs Chris Linker, Richard Hughes, and the law firms representing them (the Attorneys) filed this appeal from orders of the circuit court denying their request for attorney fees under the common fund doctrine, denying their request for a preliminary injunction to escrow certain funds for fees, denying their motion to reconsider

denial of their request for fees and request for escrow, and denying their motion to compel discovery.[1]

Plaintiffs James Carson, John Chaney, Jay Flanagan, and Donald Jones (plaintiffs) appeal from an order of the circuit court granting defendants Allstate Insurance Company's and the Agent Transition Severance Plan's[2] motion to dismiss plaintiffs' putative class action complaint that alleged causes of action for breach of contract and common law fraud.

For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.

## STATEMENT OF FACTS

Plaintiffs were employed by defendant, as employees, rather than independent contractors, under various forms of employment contracts, including R830, R1500, and a "General Agent" contract, as agents who sold insurance policies.[3] Plaintiffs retired, some early, or terminated their employment with defendant prior to November 1, 1999. Plaintiffs filed the instant class action against defendant seeking damages for breach of contract (count I) and common law fraud (count II), contending that defendant coerced them and others similarly situated to retire, terminate their employment, or convert to independent contractor status, at a time when defendant knew, but failed to disclose to them that, within a short period of time, it would offer lucrative severance benefits and conversion incentives to individuals who remained employed with defendant.[4]

According to plaintiffs' complaint, defendant conceived a new business plan, as early as December 1998, whereby defendant's customers would purchase policies of insurance through independent contractors, call centers, or the Internet. As part of this plan, defendant would eliminate all of its employee-agents, such as plaintiffs. Plaintiffs alleged that to effectuate this plan, defendant pressured or intimidated as many employees as possible to retire, terminate their employment contracts, or convert to independent contractor status so as to prevent

---

[1] On February 5, 2002, we granted defendants' motion to dismiss the appeal as to Linker and Hughes.

[2] Although both of these entities are appellees, Allstate is the primary defendant and when reference is made to a single defendant it is intended to mean Allstate only.

[3] There is no copy of the "General Agent" contract in the record.

[4] The original class action complaint was filed by Linker and Hughes. An amended complaint was filed thereafter, adding as representative plaintiffs Carson, Chaney, Flanagan, and Jones. The general allegations in both complaints were the same.

them from being eligible for the benefits of the program it would soon announce. According to plaintiffs' complaint, defendant held meetings with its agency managers as early as July 1999 and advised them of the incentives that were going to be offered to employees later that year. Plaintiffs further alleged that many of the employees, prior to retiring, terminating their employment, or converting to independent contractor status, inquired of the agency managers or human resource representatives as to whether they could sell their books of business or whether any other changes were under consideration. Most plaintiffs were told that no changes were being considered or known of, including being allowed to sell their books of business.

On November 10, 1999, after many employees had terminated their employment with defendant, defendant officially announced its new business plan and offered a severance plan and conversion incentives under its "Agent Transition Severance Plan" (Plan) to those employee-agents remaining with the company. Pursuant to the Plan, all employee employment contracts would terminate no later than June 30, 2000. For those employees who terminated their contracts, retired, or converted to independent contractor status between December 1, 1999, and June 30, 2000, the following options were offered. First, an employee could convert to independent contractor status under defendant's R3100S contract with certain other bonuses being given. Second, an employee could retire or terminate his or her relationship with defendant and either sell his or her books of business or select a severance program. Two severance plans were offered. The first was the base plan in which employees would receive 1 week of pay for each full year of service with defendant, up to 13 weeks, to be paid in 6 monthly installments. The second was the enhanced severance plan in which employees would receive 1 year's pay, to be paid in 24 monthly installments.

On January 11 and 14, 2000, plaintiffs' attorneys sent a demand letter to defendant, seeking the same benefits offered under the Plan for plaintiffs since the severance plan and conversion incentives were under consideration at the time plaintiffs had retired or left defendant's employ. Having received no response from defendant, plaintiffs filed their original class action complaint on April 20. The proposed class included all employee-agents who terminated their employment with defendant, in whatever manner, after December 1, 1998, and who were not offered benefits under the Plan. On May 15, defendant amended its Plan to include employees who had retired or terminated their employment subsequent to June 1, 1999. On May 18, defendant sent a letter to Linker, among others presumably, informing him of the amendment. Linker was advised that if he desired to receive

the benefits, he was required to return a signed release to defendant by July 31.

On May 31, plaintiffs filed an emergency motion to compel defendant to provide the names of putative class members with whom defendant had been communicating in connection with the class action and with whom it had made settlement offers, and to permit plaintiffs' attorneys to initiate discovery so that they could properly advise their retained clients and other putative class members. In their motion, plaintiffs alleged that after the class action had been filed, but before the class was certified, defendant made attempts to settle with putative class members, including Linker and Hughes, without communicating with counsel. The trial court denied the motion on June 1. Thereafter, defendant filed a motion to dismiss the class action complaint. In the latter part of July, Linker and Hughes accepted defendant's settlement offer and both signed releases.

On August 1, plaintiffs filed an amended complaint. Carson, Chaney, Flanagan, and Jones were added as representative plaintiffs. The causes of action remained the same. However, the Agent Transition Severance Plan[5] was added as a party defendant and a cause of action based on a violation of ERISA (29 U.S.C. § 1001 et seq. (1994)) (count III) was alleged against it and defendant.[6] On August 8, Linker, Hughes and their attorneys filed a motion for attorney fees pursuant to, inter alia, the common fund doctrine, and a motion for a preliminary injunction to escrow certain funds for fees. Defendants filed a memorandum in opposition to this motion. In addition, on September 15, defendants filed a motion to dismiss counts I and II of plaintiffs' amended class action complaint pursuant to section 2—615 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615 (West 1998)) and a motion to dismiss count III pursuant to section 2—619 of the Code (735 ILCS 5/2—619 (West 1998)). With respect to count I, defendants contended that plaintiffs failed to allege any specific contract provision that was breached and that Illinois does not recognize an independent cause of action for breach of the implied covenant of good faith in at-will employment contracts. With respect to count II, defendants contended that plaintiffs failed to plead with specificity and also failed to plead that defendant owed a special duty to plaintiffs to disclose its proposed Plan to its employees. Plaintiffs thereafter responded to defendants' motion and defendants replied.

On November 1, a hearing was held on plaintiffs' motion for fees.

---

[5]This is the entity through which the severance payments were to be made.

[6]This count is not before us on appeal.

At the hearing, plaintiffs argued that there was a "pot of approximately $10 million" to be paid to 119 former employees. According to counsel, they believed that their demand letter to defendant and the filing of the class action lawsuit prompted defendant to amend its severance plan and to offer benefits to the additional 119 employees. Following the hearing, the trial court denied plaintiffs' motion for attorney fees and for a preliminary injunction.

On November 6, following arguments by counsel, the trial court granted defendants' motion to dismiss. First, the trial court concluded that all employees, including those employed under the R830 contracts, were at-will employees. The court further concluded that there was no independent cause of action for breach of the implied covenant of good faith. The court dismissed count I with prejudice because, given the facts of the case, it did not believe that plaintiffs could cure the defects. With respect to count II, the court dismissed this count without prejudice, finding that plaintiffs failed to plead with specificity and with particularity and also that they failed to plead any special duty on the part of defendant. Plaintiffs were given leave to file a second amended complaint.

On January 16, 2001, plaintiffs filed a motion to reconsider the denial of attorney fees and preliminary injunction, relying on a recent case issued by the Illinois Supreme Court. On March 16, after defendants had responded to plaintiffs' motion to reconsider, plaintiffs filed their reply to defendants' response to their motion to reconsider, asked the court to set a hearing date on the motion, and asked the court to compel discovery against defendant should the court grant the motion to reconsider. On May 14, because plaintiffs had failed to file a second amended complaint, defendants filed a motion for entry of an order dismissing the entire cause with prejudice. On May 21, the trial court denied plaintiffs' motion to reconsider, denied plaintiffs' motion to compel discovery, and granted defendants' motion to dismiss the entire cause with prejudice. This appeal followed.

## ANALYSIS

### I. Issues on Behalf of the Attorneys

The issues with respect to the Attorneys raise questions as to the propriety of the trial court's order denying their common fund claim, denying their motion to escrow, denying their motion for reconsideration, and denying their motion to compel discovery. The Attorneys argue that our standard of review on each of these issues is *de novo* because, although it is unclear from the record the specific bases for the trial court's decision on each motion, the trial court's rulings were made without an evidentiary hearing and it made no findings of fact.

Defendants contend that the standard of review with respect to the request for fees is *de novo*, and that the standard of review with respect to the request to escrow fees and motion to compel discovery is based on an abuse of the trial court's discretion. Defendants do not set forth any standard for reviewing the trial court's motion for reconsideration.

### A. Common Fund Doctrine

The Attorneys first contend that the trial court erred in declining to apply the common fund doctrine in the instant case. They rely extensively on a recent Illinois Supreme Court decision, *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 739 N.E.2d 1263 (2000), in support of their contention that the common fund doctrine has been revitalized and clearly would apply in the instant case.

Defendants respond, in general, that *Chapman* is not applicable to the instant case. They maintain that *Chapman* relaxed impediments to recovery of attorney fees only in certain cases and that the doctrine is still applicable only in exceptional cases. According to defendants, *Chapman* did not involve a class action and does not hold that in class actions all restrictions on the doctrine have been lifted. Defendants also argue that *Chapman* left untouched a long line of cases holding that the common fund doctrine is not applicable to putative class actions. Defendants also maintain that the Attorneys are misdirecting the doctrine because they are attempting to impose it against defendants, rather their clients—the proper parties.

■ The common fund doctrine allows an attorney "who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees." *Chapman*, 193 Ill. 2d at 572-73. The doctrine "rests upon the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched." *Bishop v. Burgard*, 198 Ill. 2d 495, 509, 764 N.E.2d 24 (2002). The basis for the court's authority to award fees under this doctrine is the power to do equity in a particular situation. *Sprague v. Ticonic National Bank*, 307 U.S. 161, 166, 83 L. Ed. 1184, 1187, 59 S. Ct. 777, 780 (1939). "To sustain a claim under the common fund doctrine, the attorney must show that (1) the fund was created as the result of legal services performed by the attorney, (2) the subrogee or claimant did not participate in the creation of the fund, and (3) the subrogee or claimant benefited or will benefit from the fund that was created." *Bishop*, 198 Ill. 2d at 508. Whether the common fund doctrine applies to any particular case is a question of law which we

review *de novo*. See *Janes v. Western States Insurance Co.*, 335 Ill. App. 3d 1109, 1124 (2001) (Goldenhersh, J., concurring in part and dissenting in part).

In *Chapman*, the wife of a deceased individual retained counsel (the plaintiff in *Chapman*) to file a wrongful death lawsuit in Missouri. After working on the case for three years, the plaintiff settled for $800,000 on behalf of the deceased heirs, including the wife and the deceased's parents (the defendants in *Chapman*). *Chapman*, 193 Ill. 2d at 562. Shortly before the hearing on the wife's petition to approve settlement in the wrongful death lawsuit, the defendants retained their own attorney, who intervened in the lawsuit. Following a hearing, the court awarded the wife 86% of the settlement and 14% to the defendants. The plaintiff was awarded a one-third attorney fee out of the wife's portion of the settlement. *Chapman*, 193 Ill. 2d at 562. Thereafter, the plaintiff filed a lawsuit against the defendants, seeking attorney fees out of the portion of the settlement awarded to them based on the common fund doctrine. *Chapman*, 193 Ill. 2d at 563. The trial court granted the defendants' motion to dismiss the common fund claim, concluding that it was inapplicable to the case before it. *Chapman*, 193 Ill. 2d at 564. The appellate court reversed. *Morris B. Chapman & Associates v. Kitzman*, 307 Ill. App. 3d 92, 716 N.E.2d 829 (1999).

On appeal to the supreme court, the *Chapman* court first determined that Illinois law with respect to the common fund doctrine, not Missouri law, applied. *Chapman*, 193 Ill. 2d at 567-72. The *Chapman* court then rejected the defendants' argument that the common fund doctrine was only applicable in class actions and insurance subrogation cases, finding that the doctrine was applicable to " 'many types of cases covering a large range of civil litigation,' \*\*\*. [Citation.]" *Chapman*, 193 Ill. 2d at 573. The *Chapman* court next rejected the defendants' argument that a full segregated fund must be under the court's control (*Chapman*, 193 Ill. 2d at 574-75), relying on *Sprague*. The *Chapman* court concluded that "the doctrine may be applied where a fund, for all practical purposes, has been created for the benefit of others." *Chapman*, 193 Ill. 2d at 576. The *Chapman* court then distinguished three cases decided by this court in which we found in each case that the common fund doctrine was not applicable since the attorneys in those cases did not obtain any existing or identifiable monetary award for a class. *Chapman*, 193 Ill. 2d at 576-77. In contrast, the *Chapman* plaintiff had pursued the wrongful death case for three years and secured a settlement for all heirs, including the defendants. As a result of the plaintiff's work, the defendants were awarded $112,000. The *Chapman* court found that the settlement was

a fund and that the plaintiff was entitled to attorney fees out of the fund. *Chapman*, 193 Ill. 2d at 578. The *Chapman* court lastly rejected the defendants' argument that the common fund doctrine was not applicable because the fund was not controlled by any Illinois court, holding "that the mere fact that the fund is not within the actual control of the Illinois courts is not determinative of [the plaintiff's] claim." *Chapman*, 193 Ill. 2d at 578.

■ We do not find *Chapman* persuasive, or controlling, in the instant case. *Chapman* did not involve a class action and, therefore, does not set forth the parameters or analysis necessary when the common fund doctrine is raised in class action lawsuits. Moreover, *Chapman* is factually distinguishable. The attorney there worked on the case for three years and actually negotiated the settlement. Here, the Attorneys did not negotiate any settlement with defendant. Further, one lump sum, whether under the control of the court or not, was received in the *Chapman* settlement, whereas in the instant case, there were 119 different severance packages received. In addition, the beneficiaries of the settlement in *Chapman* knew about the case before the merits were decided and were parties to the proceedings. Here, the beneficiaries are not parties to the proceedings.[7] Lastly, the attorney in *Chapman* sought to receive fees from the parties who benefitted from the settlement, not from the payor of the settlement as in the instant case.

We conclude that application of the common fund doctrine is not appropriate in this case because the Attorneys seek to recover fees from the wrong parties (defendants) and they have not brought the proper parties before the court (the settling employees). The law is clear that counsel must seek fees from the beneficiaries of counsel's services, not from the adversaries (defendants here). See, *e.g.*, *Chapman*, 193 Ill. 2d at 576-77; *Hamer v. Kirk*, 64 Ill. 2d 434, 436, 356 N.E.2d 524 (1976); *Rosemont Building Supply, Inc. v. Illinois Highway Trust Authority*, 51 Ill. 2d 126, 128, 281 N.E.2d 338 (1972).

Based on our finding that the common fund doctrine is inapplicable in this case, we need not determine whether a fund was, for all practical purposes, created. Similarly, we need not address the Attorneys' arguments with respect to preemption, the effect of the releases and settlements entered into and whether they bar the Attorneys' claim for fees, nor the Attorneys' argument with respect to the fact that application of the common fund doctrine does not require a meritorious

---

[7]We can presume, however, that the beneficiaries did in fact have notice of the class action lawsuit as the releases they were required to sign specifically referenced the case.

judgment by the court, but, rather, the underlying cause of action must only set forth nonfrivolous claims. Accordingly, we find that the trial court did not err in denying application of the doctrine.

## B. Discovery and Preliminary Injunction

Because we have concluded above that the common fund doctrine was not applicable under the circumstances presented here, the Attorneys' arguments regarding the issues of discovery and a preliminary injunction need not be addressed since they are moot.

## II. Appeal Issues on Behalf of Individual Plaintiffs

Plaintiffs contend that the trial court erred in dismissing their amended complaint (complaint) for breach of contract and common law fraud against defendants pursuant to section 2—615 of the Code. A motion to dismiss pursuant to section 2—615 of the Code challenges the legal sufficiency of a plaintiff's complaint. *Joseph v. Chicago Transit Authority*, 306 Ill. App. 3d 927, 930, 715 N.E.2d 733 (1999). When reviewing the sufficiency of a complaint, the court must accept as true all well-pleaded facts and all reasonable inferences that can be drawn from those facts. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86, 672 N.E.2d 1207 (1996). It is the court's duty to determine, considering the allegations of the complaint in the light most favorable to the plaintiffs, whether the allegations are sufficient to state a cause of action upon which relief may be granted. *Board of Directors of Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 424, 712 N.E.2d 330 (1999). The complaint should not be dismissed unless it is clear that the plaintiffs could prove no set of facts that would entitle them to relief. *Bryson*, 174 Ill. 2d at 86-87. We review the trial court's decision on a motion to dismiss *de novo*. *Neade v. Portes*, 193 Ill. 2d 433, 439, 739 N.E.2d 496 (2000).

## A. Breach of Contract Claim

Plaintiffs contend that the trial court erred in dismissing count I of their complaint because they set forth four bases for breach of contract. In general, defendants respond that none of the theories advanced by plaintiffs are viable because of the express at-will language in the employment contracts. Defendants also argue that plaintiffs failed to reference any specific contract provision in support of any of their arguments.

First, plaintiffs argue that they set forth sufficient allegations that defendant breached the termination provisions of the employment contract because defendant engaged in concerted efforts to drive out employees before announcing its new plan rather than terminating the employees for cause. In this regard, plaintiffs maintain that the

trial court erred in holding that they were at-will employees. While plaintiffs concede that the R1500 employment contracts are at will, they maintain that the R830 employment contract allows termination only for cause and is not an at-will contract. Although noting that there is a split of authority in the Seventh Circuit federal court[8] as to whether the R830 contracts require cause, plaintiffs argue that the better interpretation of the contract is that it does require cause. Otherwise, according to plaintiffs, the review procedure provided for in the contract would be meaningless. Plaintiffs further argue that the R830 contract, unlike the R1500 contract, does not use at-will language and should be construed against defendant, the drafter, who clearly knew how to draft an at-will contract.

Defendants contend that both employment contracts are at will. Specifically, the R830 contract does not contain any specific term of employment and provides that the contract can be terminated by either party upon written notice. According to defendant, its termination rights are only limited when an employee is dismissed for unsatisfactory performance.

Plaintiffs counter that the R830 contract contains no at-will language, such as dismissal at will, or for any or no reason. According to plaintiffs, every employee was guaranteed a review procedure prior to termination, which procedure is contrary to a finding that the contract allowed for termination at will or without cause.

Section XI of the R830 contract, with the amendments incorporated, provides:

> "[1] This agreement will automatically terminate upon your death. Either you or Allstate have the right to terminate this agreement upon mailing to the other, at his or its last known address, written notice of termination. ***
>
> ▪ The Company will not terminate your employment because of unsatisfactory work unless you have been notified that your work is unsatisfactory and that your job is in jeopardy and unless you have been given a reasonable opportunity to bring your performance up to satisfactory standards.
>
> ▪ The term 'unsatisfactory work' relates to the quality of performance. Notification that your job is in jeopardy is not required in the event of termination of employment for a criminal act or an act of dishonesty, such as, by way of example but not limited to, the following: embezzlement, *** fraud or misrepresentation of material fact, or forgery. Such notification is also not required in the event of termination of employment resulting from

---

[8]The split is not in the Seventh Circuit; rather, it is among the various circuits and districts of the federal courts.

the violation of a provision of Section II of PART FOUR of your agreement [agreement not to work for or represent anyone else while working for Allstate].

■ If this agreement is terminated by the Company, you have the right to a review by the Agent Review Board as set forth in the Agents Procedure Manual, unless such termination was in accordance with the provisions of a Career Foundation Agreement Amendment held by you.

■ In no event shall an employee be released for any reason without the following review and approval procedure having been adhered to:

(1) For employees with less than four years service, review and approval by the Regional Manager.

(2) For employees with more than four years, but less than ten years service, additional review and approval by the Zone Personnel Manager and the Zone Vice President are required.

(3) For employees with more than ten years service, review and approval in the Home Office by the Personnel Vice President are required in addition to the above."

Five federal cases have construed the language of the R830 contract. Four have concluded that defendant does not need cause, with the exception of dismissal for unsatisfactory performance, in order to dismiss an employee. See *Kaniff v. Allstate Insurance Co.*, 121 F.3d 258 (7th Cir. 1997); *Hudson v. Allstate Insurance Co.*, 93 F.3d 296 (7th Cir. 1996); *Gonzalez v. Allstate Insurance Co.*, No. 87—6101 (11th Cir. November 7, 1988) (unpublished order); *Szot v. Allstate Insurance Co.*, 161 F. Supp. 2d 596 (D. Md. 2001). One court has concluded that Allstate must have cause to dismiss any employee. *Morales v. Allstate Insurance Co.*, No. C—95—02308 (N.D. Cal. October 13, 1995).[9]

■ In *Hudson*, the court first set forth Illinois's general rules with respect to at-will employment, stating:

"Illinois follows the rule that 'an employment relationship without a fixed duration is terminable at will by either party.' [Citations.] In order to overcome that presumption, we must find evidence in the contract that shows that the parties intended to require All-

---

[9]Although plaintiffs here also cite to *Turner v. Allstate Insurance Co.*, 902 F.2d 1208 (6th Cir. 1990), in support of their argument that the R830 contract should be construed to require cause for dismissal, it has been noted that *Turner* did not quote the contract language it was construing and the contract it was construing was perhaps not the R830 contract. See *Hudson*, 93 F.3d at 300 ("For all we can tell, the contract that Turner had signed was different from Hudson's and contained a promise not to terminate him except for good cause"). See also *Szot*, 161 F. Supp. 2d at 602 n.2 (stating that it was unclear whether the *Turner* court was construing the same language).

state to prove good cause for Hudson's termination.[10] The language 'must contain a premise clear enough that an employee would reasonably believe that an offer had been made.' [Citations.]" *Hudson*, 93 F.3d at 299.

The *Hudson* court then noted that the R830 contract had elements of both at will and "a limited promise of greater protection." *Hudson*, 93 F.3d at 299. However, the *Hudson* court concluded that there was nothing in the R830 contract that limited Allstate from terminating any employee "for any reason at all" except for unsatisfactory performance. *Hudson*, 93 F.3d at 300. Specifically, the *Hudson* court stated:

"The fact that the agreement goes out of its way to specify that notice is not required if the basis of termination is a criminal or dishonest act (as opposed to any myriad of other reasons that do not amount to 'unsatisfactory work,' but are neither criminal nor dishonest) cannot be transformed into a general rule requiring All-state to demonstrate that its reason for termination qualified as 'good cause' in all cases." *Hudson*, 93 F.3d at 300.

*Kaniff*, another Seventh Circuit case, simply followed *Hudson* (*Kaniff*, 121 F.3d at 266), and *Szot* found *Hudson* more persuasive than *Morales* and chose to follow *Hudson* (*Szot*, 161 F. Supp. 2d at 602).

Conversely, the *Morales* court first quoted section XI and concluded:

"This provision indicates that Allstate may not terminate an employee for any reason, at any time. There must be unsatisfactory work, notice and opportunity to cure. Hence, good cause is required to terminate an employee." *Morales*, slip op. at ___.

With respect to the review procedures, the *Morales* court stated that "[a]lthough defendant's counsel argued that the review was only a procedure, such procedures are meaningless if the reviewing process is a rubber stamp—one must believe that the process protects an employee from a wrongful discharge." *Morales*, slip op. at ___. With respect to the amendment of the contract, the *Morales* court stated:

"This language does not cause the agreement to revert to an at will contract. The addendum only provides that for certain types of particularly bad employee conduct (criminal acts, dishonesty), the employer is not required to give [the] employee notice or an opportunity to change. Contrary to Allstate's position, the language does not mean that Allstate need not have good cause for discharge. It simply means that if Allstate has good cause, for certain types of behavior, it need not give the employee an opportunity to improve or change." *Morales*, slip op. at ___.

---

[10]Hudson was terminated for dishonesty.

We do not find *Hudson* persuasive or controlling. When the *Hudson* court quoted the contract language, it merged the first and second paragraphs into one paragraph. Then, although stating that it was bound by the plain language of the contract, the court nonetheless ignored certain plain language in the contract. Specifically, the court ignored paragraph four. Although the court did mention this provision in passing, it never addressed or analyzed its affect on the entire contract. The court also entirely ignored paragraph five in its analysis. Moreover, although Allstate in *Hudson* argued that procedural requirements such as notice and a review procedure prior to termination do not turn the agreement into a contract for cause, the court failed to address this contention. It should be noted that the cases relied upon by Allstate in *Hudson* to support this contention (*Mitchell v. Jewel Food Stores*, 142 Ill. 2d 152, 568 N.E.2d 827 (1990); *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 505 N.E.2d 314 (1987)) in fact directly contradict it. Both cases held that procedural requirements set forth in a company manual, where the manual is found to constitute a binding contract between the parties, must be complied with prior to a proper termination of an employee.[11] See *Ahlgren v. Blue Goose Supermarket, Inc.*, 266 Ill. App. 3d 154, 161, 639 N.E.2d 922 (1994) (stating that "articulated procedures are a fundamental and necessary part of an employment contract which provides for an employee's discharge or dismissal only upon just cause"). Moreover, *Hudson* did not address the issue of good faith or a requirement that Allstate not act with bad faith in all circumstances. In *Hudson*, the terminated employee admitted to acting dishonestly. Thus, *Hudson* does not negate the fact that there may be a requirement that a defendant cannot act in bad faith even for terminations other than unsatisfactory work. The *Hudson* court simply did not address this issue. As discussed below, defendant must do something more, in terminating an employee, other than saying, "There's the door, go." Accordingly, we do not accept *Hudson*'s ultimate conclusion that cause is not needed to terminate an employee with respect to the contract in the instant case.

■ The contract here provides protections for *every* employee and is, therefore, not an at-will contract. In Illinois, although an employer-employee relationship without a fixed duration is terminable at will by either party, this is only a rule of construction and the presumption can be overcome "by demonstrating that the parties contracted otherwise." *Ahlgren*, 266 Ill. App. 3d at 160. This is precisely what the parties here did with respect to the R830 contract.

[11]Note, in these cases, the procedures were not even set forth in the contract of employment, as in our case, but were stated elsewhere.

The relevant contract provision, as amended, contains five paragraphs. The first paragraph sets forth the alleged at-will provision. The second paragraph relates to unsatisfactory work and the procedures that must be followed should defendant wish to terminate an employee on this basis. The third paragraph relates to criminal conduct, in essence, and the fact that no notice is required prior to termination. The examples set forth in this paragraph would constitute material breaches of the contract in any event and, therefore, would terminate it. The fourth and fifth paragraphs are independent and are not limited to either paragraph two or three.

Whether the first paragraph is even an at-will provision is questionable. The contract does not use at-will language such as "at will," "for no reason," or "for any reason." Moreover, the contract requires written termination notice. Conversely, the R1500 contract, which is undisputedly an at-will contract, provides that the agreement "may be terminated at will by either party." Additionally, notice of termination under the R1500 contract may be oral or written. Clearly, defendant drafted two different contracts with different language and, thus, must have intended the contracts to set forth different terms of employment.

Moreover, if the R830 contract was intended to be an at-will contract, there would be no logical or rational reason to include paragraphs two or three. Such provisions would be superfluous. Likewise, if the contract was an at-will contract, there would be no rational reason to include paragraphs four or five. Again, paragraph four is not limited to any particular reason for termination and paragraph five clearly states that it applies to termination for "any reason." If the contract was truly at will, all defendant would have to say is, "There's the door, you're gone." However, the contract does not allow this. Defendant has provided for a review procedure; in fact, it appears that there may be two different forms of review procedures.[12] In any event, based on the fact that employees are given some sort of review for termination for *"any reason,"* it must therefore be concluded that the contract is not an at-will contract.

In this respect, it would seem to be logical that, because a review procedure is provided for, implied in that protection is the fact or element that defendant cannot act in bad faith in terminating an employee. Thus, there must be cause. If defendant could terminate an employee without cause, then the review provisions would be illusory

---

[12]We do not have the "Agents Procedure Manual" referenced in paragraph four and, therefore, we cannot ascertain the exact nature of the review provided therein.

and there would be no reason to include them in the contract. We cannot ignore these provisions and must give effect to all provisions contained in the contract. Therefore, defendant, as plaintiffs' employer, "[h]aving announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, *** may not treat its promise as illusory." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 619, 292 N.W.2d 880, 895 (1980), cited by *Mitchell*, 142 Ill. 2d at 171. See also *Morales*, slip op. at ___ ("such procedures are meaningless if the reviewing process is a rubber stamp—one must believe that the process protects an employee from wrongful discharge").

█ In addition, defendant itself included these last four paragraphs in the contract, although it could simply have stopped at the end of the first paragraph. The R830 may well then have been an at-will contract. This is precisely what defendant did later in the R1500 contract. However, defendant did not stop after the first paragraph in R830. Instead, it added additional protections for employees. Because defendant drafted the contracts, they must be strictly construed against defendant. Therefore, since defendant clearly utilized different language in each contract, we must construe the R830 contract as something different than the R1500. As the court in *Mitchell* stated:

> "If defendant wants to reserve sole discretion to discharge any employee for any reason at any time, defendant could simply say so. Defendant would not then need to make a distinction between probationary employees, who may be fired for any reason, and non-probationary employees, who could be fired only for 'just cause.' " *Mitchell*, 142 Ill. 2d at 170-71.

Based on the above, we find that the R830 contract does require cause for termination. It, unlike the R1500, is not an at-will contract based on the plain language of the contract. Accordingly, we find that the trial court erred in concluding that the R830 contract was an at-will contract and erred in dismissing count I on this basis. Plaintiffs clearly alleged that defendant engaged in conduct that could be found, by a trier of fact, to be a breach of the termination with cause provision.

In conclusion, we find that plaintiffs set forth sufficient facts to state a cause of action for breach of contract, under at least one theory and, therefore, we reverse the trial court's dismissal of count I of plaintiffs' complaint.

## B. Common Law Fraud

Plaintiffs next contend that the trial court erred in dismissing their common law fraud claim because they set forth sufficient allegations to sustain this cause of action. Defendants contend that

plaintiffs' common law fraud claim lacked the specificity required by law and, further, that defendant possessed no duty to disclose, thereby defeating plaintiffs' cause of action.

## 1. Express Misrepresentation

■ We conclude that plaintiffs' complaint failed to sufficiently allege a cause of action based on express misrepresentation because the allegations were not sufficiently specific or particular. See *Hirsch v. Feuer*, 299 Ill. App. 3d 1076, 1085, 702 N.E.2d 265 (1998). Accordingly, the trial court did not err in dismissing count II of plaintiffs' complaint on this basis.

## 2. Misrepresentation by Fraudulent Concealment

■ We conclude that plaintiffs' complaint failed to sufficiently allege a cause of action based on misrepresentation by concealment because the allegations were not sufficiently specific or particular (*Hirsch*, 299 Ill. App. 3d at 1085) and because plaintiffs failed to allege any duty on the part of defendants (*Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500, 675 N.E.2d 584 (1996)). Accordingly, the trial court did not err in dismissing count II of plaintiffs' complaint on this basis.

In summary, we reverse the trial court's dismissal of count I of plaintiffs' complaint and remand this cause for further proceedings.

## CONCLUSION

For the reasons stated, we affirm in part, reverse in part, and remand this cause to the circuit court of Cook County.

Affirmed in part; reversed in part; and remanded.

GORDON and McBRIDE, JJ., concur.